LISBON SQUARE, a limited partnership; Wrightown Partnership, a limited partnership; MWD Enterprises, Incorporated, a Wisconsin corporation; and Jordan A. Miller, as the sole general partner of Lisbon Square and Wrightown partnerships and president of MWD Enterprises, Inc., Plaintiffs,

v.

UNITED STATES of America; Terry Gray, in his capacity as Foreclosure Commissioner; and Henry G. Cisneros,[1] in his capacity as Secretary of the Department of Housing and Urban Development, Defendants.

No. 91–C–281.

United States District Court, E.D. Wisconsin.

May 19, 1994.

---

1. Originally named was Jack Kemp; his successor, Henry G. Cisneros, is automatically substituted as defendant pursuant to Federal Rule of Civil Procedure 25(d).

484

Michael B. Apfeld, Mark E. Sostarich, Godfrey & Kahn, Milwaukee, WI, for plaintiffs.

Lynne M. Solien, Asst. U.S. Atty., Milwaukee, WI, John H. Mahoney, Associated Regional Counsel, Dept. of HUD, Chicago, IL, for defendants.

### DECISION AND ORDER

WARREN, Senior District Judge.

Before the Court is the defendants' Motion for Summary Judgment on the Plaintiff's Claims and for Partial Summary Judgment on Counts I and III of the Defendants' Counterclaim pursuant to Federal Rule of Civil Procedure 56 ("Rule 56") in the above-captioned matter. For the following reasons, the Court (1) finds that it either lacks jurisdiction, or that the defendants are entitled to summary judgment, as to each of the plaintiff's claims, (2) grants summary judgment for the defendants in the amount of $590,-000.00 as to Count I of their counterclaim,

and (3) denies summary judgment for the defendants as to Count III of their counter-claim.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

Plaintiffs Lisbon Square and Wrightown Partnership ("Wrightown") are limited partnerships organized under the laws of the State of Wisconsin. (Defs.Am.Countercl. at ¶¶ 1, 2.) Plaintiff Jordan A. Miller has acted as the sole general partner of both Lisbon Square and Wrightown since 1976. (*Id.* at ¶ 3; Defs.Mem. in Supp. of Summ. J., Ex. I.) At all times relevant hereto, M.W.D. Enterprises, Inc. ("M.W.D."), a Wisconsin corporation, provided property management services for both Lisbon and Wrightown. (Answer at ¶ 5.) Mr. Miller acted as the president of M.W.D. (Answer at ¶ 6.)

## A. *LISBON SQUARE APARTMENTS*

On Dec. 1, 1971, Lisbon Square delivered to A.L. Grootemaat & Sons, Inc. a Mortgage Note ("Note") in the amount of $1,964,800.00 secured by a Mortgage encumbering real and personal property comprising the Lisbon Square Apartments, a low-income housing unit containing twenty (20) two-story buildings with a total of 115 units. (Answer at ¶ 3; Defs.Mem. in Supp. of Summ. J., Ex. A and B.) The Mortgage, *inter alia,* assigned all rents, profits and income from Lisbon Square to the Mortgagee, (*Id.,* Ex. B at ¶ 4), granted to the Mortgagee the option of automatic foreclosure upon failure by Lisbon Square to remedy nonpayment within one month, (*Id.,* Ex. B at ¶ 16), and incorporated by reference a document entitled "Regulatory Agreement." (*Id.,* Ex. B at ¶ 3, Ex. D). On July 10, 1977, the parties altered the payment schedule of the Mortgage pursuant to a Modification Agreement. (Lierman Aff. ¶ 3; Def.Mem. in Supp. of Summ. J., Ex. C.) By February 18, 1977, defendant Secretary of Housing and Urban Development ("HUD") became the owner and holder of the Note and Mortgage through various assignments. (Lierman Aff. ¶ 6.)

The Regulatory Agreement, entered into between Lisbon Square and HUD pursuant to § 236 of the National Housing Act, 12 U.S.C. § 1715z–1, required HUD to provide Lisbon Square with mortgage insurance and interest reduction payments so that reduced rents could be charged to low-income tenants. (Defs.Mem. in Supp. of Summ. J., Ex. D at ¶ 4; Countercl. at ¶ 8.) In return, Lisbon Square agreed to abide by a number of conditions, including receiving distributions of assets or income from the Lisbon Square Apartments out of surplus cash only,[2] and receiving no distributions at all if the Lisbon Square Apartments ever entered default status. (Defs.Mem. in Supp. of Summ. J., Ex. D.)

Lisbon Square fell behind in its mortgage payments to HUD, thereby defaulting on the loan, between 1988 and mid–1991. (Lierman Aff. at ¶¶ 6, 7; Miller Aff. at ¶ 4.) A 1988 CPA audit of Lisbon Square, certified as "complete and accurate" by Mr. Miller, stated that:

> "[d]uring 1988 and 1987 and subsequent to the date of the financial statements, the partnership advanced funds to the General Partner (or entities controlled by the General Partner) in excess of amounts permitted under the regulatory agreement with the U.S. Department of Housing and Urban Development ("HUD"). These advances are reported in the financial statements as a receivable from the General Partner and have not been offset against the $290,394 "Liability to general partner" as of December 31, 1988. Under the terms of the regulatory agreement, if this condition remains uncorrected, HUD may take certain actions which could adversely effect the financial condition and/or future operations of the partnership."

(Defs.Mem. in Supp. of Summ. J., Ex. L) The audit also indicated that, as of December 31, 1988, Lisbon Square possessed no surplus cash. (*Id.*) Moreover, mortgage interest, principal and escrow payments to HUD were $84,341.00 in arrears as of that date. (*Id.*)

---

**2.** "Surplus Cash" was defined as, *inter alia,* "any cash remaining after (1) the payment of: (i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Federal Housing Commissioner." (Defs.Mem. in Supp. of Summ. J., Ex. D.)

On October 4, 1989, Lisbon Square, through Mr. Miller, entered into a Provisional Workout Arrangement ("PWA") with HUD, acknowledging that the Note and Mortgage were in default, that HUD was entitled to possession upon demand upon subsequent default, that "funds totaling approximately *$197,000* were improperly withdrawn from the project accounts," and that it would abide by the payment schedule contained therein. (Lierman Aff. at ¶ 8; Defs. Mem. in Supp. of Summ. J., Ex. E; Miller Aff. at ¶ 5.) Lisbon Square, however, failed to make the payments required under the PWA, failed to make its May 1, 1990 mortgage payment, and made no subsequent payments restoring the loan to current status. (Lierman Aff. at ¶¶ 8, 9.) As a result, in a July 19, 1990 letter to Mr. Miller, the United States declared the entire principal balance of the Note due and its intention to commence non-judicial foreclosure proceedings. (Defs.Mem. in Supp. of Summ. J., Ex. F.) The letter informed Mr. Miller that he could request an informal meeting to discuss legal reasons why foreclosure should not occur. (*Id.*)

On March 22, 1991, the defendants [3] filed a Complaint for Possession of Mortgaged Property in the above-captioned matter. On May 1, 1991, a non-judicial foreclosure sale was held at public auction, and the Lisbon Square Apartments were sold to a third party for $58,000.00; no deficiency judgment was sought. (Lierman Aff. at ¶¶ 21, 22.) According to HUD, the property was so deteriorated that letters of credit totalling $783,000.00 were required to insure performance of necessary repairs, which were accomplished by the new owner. (*Id.*)

## B. *WRIGHTOWN APARTMENTS*

The history of the Wrightown Apartments mirrors that of the Lisbon Square project. On Aug. 1, 1971, Wrightown delivered to A.L. Grootemaat & Sons, Inc. a Mortgage Note in the amount of $933,800.00 secured by a Mortgage encumbering real and personal property comprising the Wrightown Apartments, a low-income housing unit comprising six (6) buildings and seventy-two (72) units.

(Defs.Mem. in Supp. of Summ. J., Ex. G and H.) Again, the Mortgage, *inter alia*, assigned all rents, profits and income from Wrightown to the Mortgagee, (*Id.*, Ex. H at ¶ 4), granted to the Mortgagee the option of automatic foreclosure upon failure by Wrightown to remedy nonpayment within one month, (*Id.*, Ex. H at ¶ 16), and incorporated by reference a document entitled "Regulatory Agreement." (*d.*, Ex. H at ¶ 3, Ex. I). Wrightown and HUD entered into a Regulatory Agreement virtually identical to that involving Lisbon Square. (*Id.*, Ex. I.) Again, by December 2, 1976, HUD became the owner and holder of the Note and Mortgage through various assignments. (Lierman Aff. ¶ 15.)

Wrightown fell behind in its mortgage payments to HUD, thereby defaulting on the loan, between 1988 and mid–1991. (Lierman Aff. at ¶¶ 15, 16; Miller Aff. at ¶ 4.) As with Lisbon Square, a CPA audit found that approximately $256,197.00 had been advanced to Mr. Miller in violation of the Regulatory Agreement, that Wrightown had no surplus cash as of December 31, 1988, and that Wrightown owed $43,279.00 in mortgage interest, principal and escrow payments. (Lierman Aff. at ¶¶ 17, 18; Defs.Mem. in Supp. of Summ. J., Ex. M.)

On October 4, 1989 (the same day as the Lisbon Square PWA), Wrightown, through Mr. Miller, entered into a PWA with HUD, acknowledging that the Note and Mortgage were in default, that HUD was entitled to possession upon demand upon subsequent default, that "funds totaling approximately *$98,000* were improperly withdrawn from the project accounts," and that it would abide by the payment schedule contained therein. (Lierman Aff. at ¶ 17; Defs.Mem. in Supp. of Summ. J., Ex. J; Miller Aff. at ¶ 5.) Wrightown, however, failed to make the payments required under the PWA, failed to make its May 1, 1990 mortgage payment, and made no subsequent payments restoring the loan to current status. (Lierman Aff. at ¶¶ 17, 19.) As a result, in a July 19, 1990 letter to Mr. Miller, the United States declared the entire principal balance of the Note due and its

---

3. *See infra* page 491.

intention to commence non-judicial foreclosure proceedings. (Defs.Mem. in Supp. of Summ. J., Ex. K.) The letter informed Mr. Miller that he could request an informal meeting to discuss legal reasons why foreclosure should not occur. (*Id.*)

On March 22, 1991, the United States[4] filed a Complaint for Possession of Mortgaged Property in the above-captioned matter. On May 1, 1991, a non-judicial foreclosure sale was held at public auction, and the Wrightown Apartments were sold to a third party for $36,500.00; no deficiency judgment was sought. (Lierman Aff. at ¶ 23.) According to HUD, the property was so deteriorated that letters of credit totalling $621,000.00 were required to insure performance of necessary repairs, which were accomplished by the new owner. (*Id.*)

## C. *PROCEDURAL BACKGROUND*

As previously indicated, the United States filed with this Court a Complaint for Possession of Mortgaged Property on March 22, 1991, alleging indebtedness of $1,501,583.98 for Lisbon Square and $780,938.20 for Wrightown, and seeking possession of the two apartment projects pursuant to the Mortgages and Regulatory Agreements. Terry Gray was named foreclosure commissioner, and non-judicial foreclosure auctions were scheduled May 1, 1991 pursuant to 12 U.S.C. § 3701 *et seq.* On April 30, 1991, Mr. Miller, Lisbon Square, Wrightown, and MWD filed their Answer, Affirmative Defenses and Counterclaims, interpleading Mr. Gray and then-HUD Secretary Jack Kemp as additional parties and seeking to enjoin the auction set for the next day. At a hearing the morning of May 1, their request for a temporary restraining order was denied and the auction proceeded as scheduled. On June 27, 1991, the United States, Mr. Gray, and Mr. Kemp filed their Answer and Affirmative Defenses to Counterclaims; on July 22, 1991, Lisbon, Wrightown, MWD, and Mr. Miller filed Amended Counterclaims.

On August 28, 1991, pursuant to stipulation by the parties, this Court dismissed the United States' Complaint as moot because the foreclosure sale had been executed, and re-captioned the case to list Mr. Miller, Lisbon Square, Wrightown, and MWD as the plaintiffs and the United States, Mr. Gray, and Mr. Kemp as the defendants. On September 5, 1991, the federal defendants filed their Answer, Affirmative Defenses and Counterclaims to the plaintiffs' July 22 Amended Counterclaims (hereafter referred to as "plaintiffs' claims"); the plaintiffs replied on Oct. 11, 1991.

On June 25, 1993, plaintiffs' counsel, Mark E. Sostarich, asked to withdraw from this case. On July 26, 1993, the defendants filed the instant motion, requesting summary judgment on each of the plaintiffs' claims as set forth in their July 22, 1991 Amended Counterclaims, as well as Counts I and III (Breach of Contract–Illegal Diversion and Unjust Enrichment) of their September 5, 1991 Counterclaims. The Court granted Mr. Sostarich permission to withdraw on September 2, 1993, and notified the plaintiffs that they had fourteen (14) days thereafter to respond, with or without counsel, to the defendants' summary judgment motion. On September 30, 1993, the Court received a letter from Mr. Miller stating that, given his financial difficulties, he had been unable to find replacement counsel.

■ As a *pro se* litigant, Mr. Miller was entitled to notice of the consequences for failing to respond to a summary judgment motion. *Timms v. Frank,* 953 F.2d 281, 285 (7th Cir.), *cert. denied* —— U.S. ——, 112 S.Ct. 2307, 119 L.Ed.2d 228. Because the federal defendants failed to supply such notice, the Court became obligated to do so; in a March 30, 1994 letter to Mr. Miller, the Court, *inter alia,* recited the language of Rule 56(e) and informed Mr. Miller that a failure to respond to the defendants' factual allegations with counter-affidavits or other documentary evidence would result in the Court regarding such allegations as true and may result in the entry of summary judgment. *See id.* Mr. Miller responded by letter on April 18, 1994, informing the Court that he remained unrepresented and asking us to consider earlier affidavits and pleadings

4. *Id.*

filed by the plaintiffs in rendering our decision.

## II. *STANDARD OF REVIEW*

### A. *SUMMARY JUDGMENT*

■ Rule 56(c) deems summary judgment appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A genuine issue of fact exists only where a reasonable jury could make a finding in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990). An issue of fact must also be material, as "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. *See also Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir.1992); *Local 1545, United Mine Workers of Am. v. Inland Steel Coal Co.,* 876 F.2d 1288, 1293 (7th Cir.1989). The presence of a genuine issue of material fact is to be determined by the substantive law controlling that case or issue. *Anderson,* 477 U.S. at 254–55, 106 S.Ct. at 2513–14; *Santiago,* 894 F.2d at 221. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine need for trial and summary judgment is proper. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ The moving party has the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53; *Local 1545,* 876 F.2d at 1292. Once this burden is met, the non-moving party must "go beyond the pleadings" and designate specific facts to support or defend each element of the cause of action, showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Local 1545,* 876 F.2d at 1293. Neither party may rest on mere allegations or denials in the pleadings, *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Koclanakis v. Merrimack Mut. Fire Ins. Co.,* 899 F.2d 673, 675 (7th Cir.1990), or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir.1985), and both parties must produce proper documentary evidence to support their contentions. *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990); *Local 1545,* 876 F.2d at 1293. In deciding a summary judgment motion, the Court must view the record in the light most favorable to the non-moving party, and all reasonable inferences shall be drawn in that party's favor. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Santiago,* 894 F.2d at 221. A court need not draw every inference from the record, only reasonable inferences. *Local 1545,* 876 F.2d at 1292–93; *Spring v. Sheboygan Area Sch. Dist.,* 865 F.2d 883, 886 (7th Cir.1989).

### B. *PLAINTIFFS' LACK OF COUNSEL*

■ In deciding a motion for summary judgment, the court must conclude that there is no genuine material issue as to any proposed finding of fact to which no response is set out. Local Rule 6.05(d), United States District Court for the Eastern District of Wisconsin (Jan. 15, 1993). Local rules are strictly applied; therefore, assuming that a party moving for summary judgment properly supports its statements of facts by references to the record or other evidentiary material, such facts are taken as admitted by a non-movant who fails to respond. *Appley v. West,* 929 F.2d 1176, 1179–80 (7th Cir.1991). The court, however, remains obliged to consider the motion for summary judgment on its merits, in light of the record, and must determine whether the moving party is entitled to judgment as a matter of law. *Id.; Kelly v. U.S.,* 924 F.2d 355, 358 (1st Cir. 1991). In applying these rules, the court must remain mindful that *pro se* litigants are treated gently, *Lockhart v. Sullivan,* 925 F.2d 214, 216 n. 1 (7th Cir.1991); *Godlove v. Bamberger, Foreman, Oswald and Hahn,*

903 F.2d 1145, 1148 (7th Cir.1990), and are commonly required to comply with standards less stringent than those applied to expertly trained members of the legal profession. *Hughes v. Rowe,* 449 U.S. 5, 9–10, 101 S.Ct. 173, 175–76, 66 L.Ed.2d 163 (1980); *Bates v. Jean,* 745 F.2d 1146, 1150 (7th Cir.1984).

### III. DISCUSSION

While represented by counsel, Mr. Miller had ample warning of the defendants' request for summary judgment. The defendants presented their counterclaims on September 5, 1991, and stated on the record in an April 26, 1993, status conference that they would be moving for summary judgment. After his attorney requested withdrawal, the Court directed Mr. Miller to obtain new counsel. While Mr. Miller has not retained substitute counsel and has made no formal response to the instant motion, he nevertheless asks the Court to consider earlier affidavits and pleadings filed by the plaintiffs in rendering this decision. Mindful of the Seventh Circuit's instructions to treat *pro se* parties with "kid gloves" for purposes of summary judgment, the Court will consider the plaintiffs' previously-filed affidavits and pleadings and, where possible, treat such documents as the plaintiff's response to the Motion for Summary Judgment. On this basis, the court shall sequentially address each of the plaintiffs' claims and the defendants' counterclaims.

### A. PLAINTIFFS' CLAIMS

#### 1. Constitutionality of the Multifamily Mortgage Foreclosure Act of 1981

The plaintiffs first claim that the Multifamily Mortgage Foreclosure Act of 1981 ("the Act"), 12 U.S.C. § 3701 *et seq.,* which allows the use of non-judicial foreclosure commissioners, is unconstitutional. They argue that the foreclosure procedures authorized therein deprive mortgagors of property without judicial oversight in violation of Fifth Amendment due process, and challenge retroactive application as unconstitutionally depriving mortgagors of their vested contract and property rights. The defendants respond that the notice procedures and judicial proceedings available to, and used by, the plaintiffs in this case adequately preserved due process. They also argue that, based on the legislative history of the Act, retroactive application was appropriate.

#### a. Due Process

Procedural due process requires that notice and an opportunity to be heard be given before the government terminates certain benefits. *Goldberg v. Kelly,* 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970). The plaintiffs in this case were protected by such safeguards. The Mortgage agreements themselves notified the plaintiffs that foreclosure was available at the option of the mortgagee for any breach and for any default not made good by the next payment date. In the same paragraphs, the parties agreed that foreclosure was available immediately upon default. In both PWAs, the plaintiffs expressly agreed that they were in default. On July 19, 1990, HUD notified the plaintiffs by certified mail that the mortgages were in default, that the entire unpaid balance was due and payable, and that "before instituting foreclosure proceedings, HUD will provide you with an opportunity to show legal reasons why foreclosure should not take place." The plaintiffs were aware of the instant action more than a month before the auction was held. The day of the auction, the plaintiffs requested, and were granted, judicial review pursuant to their motion for a temporary restraining order.

By offering a mortgagor a chance to explain the failure to make mortgage payments, HUD provides all of the due process required by the Fifth Amendment. *See Hoffman v. U.S. Dept. of Housing and Urban Development,* 519 F.2d 1160, 1165–66 (5th Cir.1975). A mortgagor who fails to respond to notices of delinquency waives the right to be heard. *Id.* at 1165. Focusing on the flurry of activity in the week preceding the auction, the plaintiffs claim that they had inadequate time to receive an adequate hearing as required under due process. However, on at least several occasions over a period of two years or more, the plaintiffs were notified that default loomed. The Court addressed the issue at least twice before the auction, and the plaintiffs had plenty of time to bring further court challenges once they

learned of the possibility of default. Based on this evidence, no reasonable jury could find facts sufficient to show that constitutional due process was violated; therefore, summary judgment in favor of the defendants is required.

### b. Contract and Property Rights

 Congressional legislation "adjusting the burdens and benefits of economic life" is presumed constitutional, and the burden is on the complaining party to establish that the legislation is arbitrary and irrational. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976); *Rhinebarger v. Orr,* 839 F.2d 387, 388 (7th Cir.1988). This applies to the retroactive application of a statute as well as long as it is "supported by a legitimate legislative purpose furthered by a rational means." *Rhinebarger,* 839 F.2d at 388, *citing Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). This is so even if the legislature's readjusting of rights and burdens "upsets otherwise settled expectations." *Id.* Moreover, contractual arrangements, including those to which the United States is a party, remain subject to subsequent legislation. *Bowen v. Agencies Opposed,* 477 U.S. 41, 52, 106 S.Ct. 2390, 2396–97, 91 L.Ed.2d 35 (1986); *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982).

 The plaintiffs have made no effort beyond the general allegations of their Counterclaims to meet their above-referenced burden. Moreover, the Act itself advances several legitimate legislative purposes for the use of non-judicial foreclosure commissioners, including the need for national uniformity in HUD foreclosures and to move quickly in preserving properties by avoiding long periods of vacancy that could result in vandalism or other damage. 12 U.S.C. § 3701(a)(1) and (a)(2). Given the legitimate legislative purposes advanced by the Act, the presumption of constitutionality, the plaintiffs' burden of proof on the issue, and the legal rule that contracts are generally subject to subsequent legislation, no reasonable jury could find that plaintiffs' contract and property rights were unconstitutionally impaired by retroactive application of the Act. Again, summary judgment for the defendants is proper.

### 2. The Foreclosure Commissioner

The plaintiffs next claim that Foreclosure Commissioner Terry Gray violated the Act, HUD regulations, and the U.S. Constitution by, *inter alia,* sending notices of default which lacked important information and failing to act impartially in resolving disputes and at auction. The defendants respond that the plaintiffs have failed to state a cause of action upon which relief can be granted. Specifically, they argue that, because Commissioner Gray is named in this suit in his official capacity and not as an individual, no relief is available based on a constitutional tort. As a result, they argue that the plaintiffs are alleging either a breach of contract claim or due process violation. Under the former, the defendants indicate that jurisdiction lies with the Court of Claims, and not this court, pursuant to 28 U.S.C. § 1491(a)(1)[5]. If the plaintiffs' claim is construed as a due process violation, on the other hand, the defendants reassert their arguments presented in the preceding discussion.

 Unless a federal official is not doing the business which the sovereign has empowered him or her to do or is doing it in a way which the sovereign has forbidden, he or she is shielded from personal liability. *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1949); *Beeman v. Olson,* 828 F.2d 620, 621 (9th Cir.1987).[6] In all other

---

**5.** 28 U.S.C. § 1346(a)(2) limits district court jurisdiction in such claims to disputes of $10,000 or less; far greater amounts are involved here.

**6.** At least one court also recognizes that, when a federal official commits an unconstitutional act, he or she is necessarily acting outside official capacity and claims are against such official in his or her individual, rather than official, capacity. *Schowengerdt v. General Dynamics Corp.,* 823 F.2d 1328, 1332–33 n. 3 (9th Cir.1987), *appeal after remand* 944 F.2d 483, *cert. denied* —— U.S. ——, 112 S.Ct. 1514, 117 L.Ed.2d 650 (1992).

circumstances, the suit remains one against the sovereign and may not be brought unless the sovereign consents. *Larson,* 337 U.S. at 693, 69 S.Ct. at 1463. Mere allegations do not establish that the officer is not exercising powers delegated by the sovereign. *Larson,* 337 U.S. at 693, 69 S.Ct. at 1463. Even where a federal officer acts outside the scope of such authority, his or her conduct is not actionable if it is simply erroneous. *Id.* at 690, 69 S.Ct. at 1461–62. Federal officials are not liable for mere mistakes in judgment, whether the mistake is one of fact or one of law, as long as the actions do not exceed delegated authority. *Butz v. Economou,* 438 U.S. 478, 507, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978); *City of Worcester v. HCA Management Co., Inc.,* 753 F.Supp. 31, 37 (D.Mass.1990). To be actionable, there must be no reasonable connection between the act and the agent's duty, and the act must be manifestly beyond his authority. *Yalkut v. Gemignani,* 873 F.2d 31, 34 (2nd Cir.1989).

The plaintiffs named Commissioner Gray as a party to this suit in his official capacity only; assuming that he acted within such authority, we must construe the plaintiffs' claim as one for either breach of contract or violation of due process. Under the former, the Court of Claims, and not this court, has jurisdiction pursuant to 28 U.S.C. § 1491(a)(1); [7] under the latter, we previously saw that non-judicial foreclosure does not violate due process.[8] However, reading their counterclaims liberally, the plaintiffs also allege that several actions taken by Commissioner Gray violated federal statutes and regulations, thereby infringing on their Constitutional rights; this constitutes a claim against him in his personal capacity. Each purported unlawful behavior by the Commissioner, and its efficacy in summary judgment, will be discussed in turn.

The plaintiffs first contend that Commissioner Gray, when sending out notices of default, failed to specify the amount of deficiency, the amount required to cure the default, or the existence and/or conditions of non-monetary default. The deficiency amounts were in fact provided on April 23, 1991, by Commissioner Gray. (Seibel Aff., Ex. G.) As to non-monetary default, 31 pages of correspondence from HUD to Mr. Miller between June 4, 1990, and Oct. 11, 1990, detailed specific findings such as "No Hot Water in Kitchen Sink" and "Two Burners on Stove Do Not Work." (Seibel Aff., Ex. G.) In addition, Commissioner Gray provided details of non-monetary defaults in revised Notices of Default and Foreclosure Sales dated·March 29, 1991. This is exactly the kind of information that the plaintiffs allege was not provided. None of this indicates that Commissioner Gray acted even made a mistake in judgment, let alone acted beyond his authority; therefore, summary judgment for the defendants is warranted.

The plaintiffs next contend that Commissioner Gray abdicated his duty to personally evaluate the existence and legal significance of the alleged defaults. This allegation stems from an April 23, 1991 meeting where Commissioner Gray apparently told the plaintiffs he was relying on figures he had obtained from HUD. (Dwyer Aff., ¶¶ 6, 9, 13.) The record shows, however, that, on April 29, 1991, Commissioner Gray made an express finding that because the defaults were in existence, the sale could proceed. (Dwyer Aff., Ex. B.) Moreover, even apart from the Commissioner's finding, the plaintiffs point us to no statutory or other authority requiring the Commissioner to make such an independent determination; the Act itself indicates that the Commissioner's duty is simply to effectuate the foreclosure, leaving the burden of proving or disproving the existence of a default to the parties. *See, e.g.,* 12 U.S.C. §§ 3709(a)(2), (c). Again, the plaintiffs present no evidence that the Commissioner violated any statutory norms; therefore, we find that he acted in accordance with his statutory authority, shielding him from liability in his personal capacity.

Thirdly, the plaintiffs claim that Commissioner Gray refused to consider certain defenses to foreclosure, including "repeated acts of breach and hindrance," by

---

7. *See supra* note 5.

8. *See supra* pages 493–494.

HUD. In fact, Gray considered, and rejected, these arguments in his April 29, 1991 finding. Moreover, affirmative defenses seeking to excuse the plaintiffs' lack of performance in their agreement with HUD are generally held to be unavailable in an action based on government foreclosure. *U.S. v. Prince Hall Village, Inc.*, 597 F.Supp. 118, 121 (C.D.Ill.1984); *U.S. v. Sherman Gardens Co.*, 298 F.Supp. 1332 (D.Nev.1967). Again, the Commissioner acted within his authority in discounting such claims; as a result, he may not be held liable in his personal capacity.

 Likewise, the plaintiffs claim that Commissioner Gray refused to consider postponement of the sale "to allow consideration of a bona fide purchaser." However, because adjournment or cancellation is at the sole discretion of the commissioner, 12 U.S.C. § 3710(c), he again acted within his authority, thereby avoiding personal liability.

 Finally, the plaintiffs claim that Commissioner Gray failed to conduct the auctions in a manner fair to the parties, and accepted a price that was too low. The evidence contained in the record, however, shows that the auctions occurred in a public forum and invoked third-party bids. HUD was allowed to bid at the auction, and bid-in at $36,000.00 for Wrightown and $57,500.00 for Lisbon Square; the properties were sold for $36,500.00 and $58,000.00, respectively. As previously indicated, HUD required the buyers to, prior to closing, provide letters of credit of $783,000.00 for Lisbon Square and $621,00.00 for Wrightown to ensure performance of needed repairs. As with most auctions, the properties were sold at below-market prices;[9] however, given the substantial risks involved in purchasing such property (including, *inter alia*, extensive damage to the property and difficulty in collecting rent), it is clear that the Commissioner conducted the auction properly and acted within his statutory authority.

Because no reasonable jury could find that Commissioner Gray was acting beyond his authority, this case is brought against him in his official capacity only; as a result, it remains an action against the sovereign. As previously indicated, the sovereign has not consented to suit in district court in this case or violated any due process norms. Therefore, no reasonable jury could find for the plaintiffs on such claims, and summary judgment for the defendants is proper.

### 3. *Default Status*

 The plaintiffs' Third Claim is that the Lisbon Square and Wrightown projects were not in default, either monetarily or non-monetarily; the defendants respond that "[t]his allegation is patently false." Letting the documents speak for themselves; as plaintiffs suggest, the Court agrees with the defendants that this claim cannot stand. Most telling is Mr. Miller's signature on the PWAs, (Def.Mem. in Supp. of Summ. J., Ex. E and J), where he "expressly acknowledges" default. As previously noted, he was also repeatedly advised in 1990 of physical deficiencies constituting non-monetary default under the terms of the agreements. Again, the plaintiffs present no other evidence supporting their claim; as a result, no reasonable jury could find for the plaintiffs, and summary judgment for the defendants is proper.

### 4. *HUD's Actions*

 In their Fourth Claim, the plaintiffs allege that "HUD and the United States have breached their contractual obligations" by, *inter alia*, keeping rent subsidies low and conducting arbitrary and unreasonable inspections which led to rent abatements, thereby causing mortgage default by hindering the plaintiffs' performance. The plaintiffs, however, are not entitled to bring such claims before this Court. First of all, as indicated by the defendants, this is a contractual claim of more than $10,000 for which the Court of Federal Claims, and not this Court, has jurisdiction. 28 U.S.C. §§ 1346, 1491. Moreover, if we view this claim as an action for tortious interference with a contract, it may be heard in district court only if admin-

---

**9.** According to the plaintiffs, Lisbon Square had an assessed value of $2,178,500.00 and estimated fair market value of $2,192,100.00 in 1989; that same year, Wrightown's assessed value was $1,180,000.00 and estimated fair market value equalled $1,197,600.00.

istrative remedies have been exhausted. 28 U.S.C. §§ 2675.[10] The plaintiffs offer no evidence as to whether they filed an administrative claim prior to bringing suit. For these reasons, the Court finds that it cannot exercise jurisdiction over this claim. Furthermore, even if the Court could exercise jurisdiction, summary judgment for the defendants would be proper because, as previously noted, "prevention doctrine" defenses are not available in government foreclosure actions; in such cases, there is no affirmative defense excusing performance based on the acts or conduct of the other party. *Prince Hall,* 597 F.Supp. at 120–21; *Sherman Gardens,* 298 F.Supp. at 1332.

### 5. Breach of Duty

██ The plaintiffs' Fifth Claim alleges that the HUD breached a duty of good faith and fair dealing in the performance of the mortgage agreements. Again, as argued by the government, this is a contract claim with jurisdiction lying with the Court of Federal Claims, not the district court. In addition, even if the Court could exercise jurisdiction, this appears to be a "prevention doctrine" defense unavailable in government foreclosures, thereby warranting summary judgment for the defendants.

### 6. Improper Taking

The plaintiffs allege in their Sixth Claim that the defendants' auction of Lisbon Square and Wrightown constituted an "improper taking" based on the inadequacy of the sale price. The government views this as either a breach of contract claim or an constitutional claim. To the extent that this claim is construed as an alleged Fifth Amendment infringement, our previous discussion shows that the plaintiffs have been given due process, thereby warranting summary judgement for the defendants. On the other hand, if this is a contract claim, we have already seen the this Court lacks jurisdiction.

### 7. Additional Claim for Damages

The plaintiffs' final claim is an "additional claim for damages" based on alleged "breaches of agreements and responsibilities" by HUD. The government responds that this claim raises no new issues and should be dismissed for reasons previously discussed. We agree with the defendants that, whether this constitutes a contractual or tortious claim, the Court lacks jurisdiction.

Considering the record in the light most favorable to the plaintiffs, we conclude that, in each of the above-referenced claims to which the Court has jurisdiction, no reasonable jury could find for the plaintiffs. Therefore, summary judgment for the defendants shall be entered on each such claim accordingly.

## B. DEFENDANTS' CLAIMS

The defendants have filed four counterclaims, on two of which they seek summary judgment.

### 1. Breach of Contract—Illegal Diversion

The defendants claim that Mr. Miller illegally diverted approximately $197,421.00 from the Lisbon Square Apartments and $100,914.00 from the Wrightown Apartments. They seek $590,000.00 under 12 U.S.C. § 1715z–4a, which permits double recovery of project funds used in violation of the Regulatory Agreements.[11] In their Reply to the

---

10. The filing of an administrative claim is a jurisdictional prerequisite, and the plaintiff's pleadings must allege exhaustion of administrative remedies. *Deutsch v. Federal Bureau of Prisons,* 737 F.Supp. 261, 266 (S.D.N.Y.1990).

11. 12 U.S.C. 1715z–4a provides, in relevant part, as follows:

"(a) Action to recover assets or income.

(1) The Secretary of Housing and Urban Development ... may request the Attorney General *to bring an action* in a United States district court to recover any assets or income used by any person in violation of (A) a regulatory agreement that applies to a multi-family project whose mortgage is insured or held by the Secretary ... or (B) any applicable regulation. For purposes of this section, a use of assets or income in violation of the regulatory agreement or any applicable regulation shall include any use for which the documentation in the books and accounts does not establish that the use was made for a reasonable operating expense or necessary repair of the project and has not been maintained in accordance with the requirements of the Secretary and in reasonable condition for proper audit ...

(b) Initiation of proceedings and temporary relief.

Defendants' Counterclaims, the plaintiffs offer a general denial and assert that the documents speak for themselves. In his affidavits, Mr. Miller also claims that the agreements were unenforceable due to HUD's actions and omissions.

■ The documents, speaking for themselves, show diversion as alleged by the government. Paragraphs 6(b) and (e) of the Regulatory Agreements prohibit the project owners from spending surplus project funds, except surplus cash, for any purpose other than reasonable operating expenses and necessary repairs. Paragraph 13(f) of the Regulatory Agreements also provides that, by definition, there is no surplus cash when the mortgage is in default. As of Dec. 31, 1988, the Mortgage Notes for both the Lisbon Square and Wrightown apartment projects were in default, with no surplus cash available for distribution. In the PWAs signed by Mr. Miller, he acknowledged that approximately $197,000 was "improperly withdrawn" from the Lisbon Square Apartments and approximately $98,000 from the Wrightown project.

Courts look to specific language of agreements, and where the language is "painfully clear," and the "import of the language and the intent of the parties [is] unmistakable," it is enforceable. *Fed. Home Loan Mortgage. Corp. v. Dutch Lane Assoc.,* 775 F.Supp. 133, 139 (S.D.N.Y.1991). Specifically, "the rule is that ... provisions in HUD mortgages and Regulatory Agreements may be enforced according to their terms and, to the extent state law requires otherwise, that state law is replaced with this federal rule." *In re Executive House Associates,* 99 B.R. 266, 275 (Bky.E.D.Pa.1989). Where "the language of the Regulatory Agreement is clear and precise," then "it is essential to the confidence of public and private lenders that its written terms be implemented and enforced by the courts." *In re Garden Manor Associates,* 70 B.R. 477, 483 (Bky.N.D.Cal.1987).

Here, the language of the Regulatory Agreements is clear and must be enforced. No funds were to be diverted from the projects while they were in default. Not only were such agreements binding on Mr. Miller, but he acknowledged in writing in the PWAs that he had improperly withdrawn money

The Attorney General, upon request of the Secretary, shall have the exclusive authority to authorize the *initiation of proceedings* under this section ...
(c) Amount recoverable.
In any judgment favorable to the United States entered under this section, the Attorney General may recover *double the value of the assets and income of the project* that the court determines to have been used in violation of the regulatory agreement or any applicable regulation, plus all costs relating to the action, including but not limited to reasonable attorney and auditing fees ...
(d) Time limitation.
Notwithstanding any other statute of limitations, the Secretary may request the Attorney General *to bring an action* under this section at any time up to and including 6 years after the latest date that the Secretary discovers any use of project assets and income in violation of the regulatory agreement or any applicable regulation.
(e) Continued availability of other remedies. *The remedy provided by this section is in addition to any other remedies available to the Secretary or the United States."*
(Emphasis added).
The Court already found that we lack jurisdiction to hear the plaintiffs' contractual claims; we therefore feel compelled to briefly explain our exercise of jurisdiction over the defendants' § 1715z–4a contractual counterclaim. *See Mar-*

*ket St. Assoc. Ltd. Partnership v. Frey,* 941 F.2d 588, 590 (7th Cir.1991) (noting that the limits of federal jurisdiction should be policed "with meticulous care"). Once the plaintiffs bought their contractual claims in this case, Federal Rule of Civil Procedure 13(a) required the defendants to "state as a counterclaim any claim ... [the defendants have against the plaintiffs], if it arises out of the transaction or occurrence that is the subject matter of the [plaintiffs'] claim ..." As indicated by the above-emphasized language, § 1715z–4a authorizes HUD to *initiate proceedings* for double damages in federal district court; it does not, by its express terms, grant this Court general jurisdiction to hear *counterclaims* for double damages brought by HUD as a defendant. However, because the defendants' § 1715z–4a claim arose out of the same "transaction or occurrence" as the plaintiffs' contractual claims, it constitutes a compulsory counterclaim which they were required to raise in this case, rather than in a separate action, under Rule 13(a). Subsection (e) of § 1715z–4a indicates that HUD, when acting as a defendant, is generally left to its regular contractual remedies, which do not include double damages; however, this rule must, by necessity, only apply HUD brings a § 1715z–4a claim as a permissive, rather than compulsory, counterclaim under Federal Rule of Civil Procedure 13(b).

from the projects. The funds did not go for the permitted operating expenses or repairs. *See Thompson v. United States,* 408 F.2d 1075, 1079–81 (8th Cir.1969) (finding that the withdrawal of project funds for reimbursement of the owners of prior advances to the operating account were not reasonable expenses incidental to the operation and maintenance of the projects). The audit statements prepared by the plaintiffs' accountants stated that the funds were advanced directly to the General Partner, Mr. Miller, and were carried as receivables from him. The government is entitled to the return of the money.

On the evidence in the record, no reasonable jury could make a finding other than that Mr. Miller used over $295,000.00 of Lisbon Square and Wrightown assets and income in violation of the Regulatory Agreements; therefore, the Court orders the entry of summary judgment for the defendants in the amount of $590,000.00, constituting double damages under 12 U.S.C. § 1715z–4a.

### 2. *Unjust Enrichment*

 In the alternative, the government also seeks recovery of the above-referenced $295,000.00 from Mr. Miller on the grounds that he was unjustly enriched by the money he withdrew from the projects in violation of the Regulatory Agreements. Again, the plaintiffs offer a general denial of this allegation. As the government notes, "the concept of unjust enrichment arises in quasi-contract situations, and the remedy is based upon quantum meruit." *Union Camp Corp. v. MW Equipment Corp.,* 711 F.Supp. 482, 483 (E.D.Wis.1989) (Gordon, J.). Generally, in order to recover on a quasi-contractual claim, the party seeking recovery must show that the opposing party was unjustly enriched at the claimant's expense. *Overseas Development Disc Corp. v. Sangamo Const. Co. Inc.,* 840 F.2d 1319, 1325 (7th Cir.1988). As previously indicated, the parties in this case entered into an enforceable agreement upon which the defendants are entitled to recover double damages under § 1715z–4a. Thus, additional recovery for unjust enrichment based on quantum meruit is not warranted, and shall not be granted by the Court.

### V. *SUMMARY*

For the foregoing reasons, the Court hereby **ORDERS** that (1) the plaintiffs' claims over which the Court lacks jurisdiction be **DISMISSED,** (2) the defendants be **GRANTED** summary judgment as to each of the plaintiffs' claims over which the Court has jurisdiction, (3) the defendants be **GRANTED** summary judgment in the amount of $590,000.00 as to Count I of their counterclaim, and (4) the defendants be **DENIED** summary judgment as to Count III of their counterclaim.

**SO ORDERED.**