**UNITED STATES of America,**
**Plaintiff,**

v.

**Richard M. SCHLESINGER,**
**et al., Defendants.**

**No. Civ. AMD 98–891.**

United States District Court,
D. Maryland.

March 10, 2000.

434

Lynne A. Battaglia, United States Attorney, Perry F. Sekus, Assistant United States Attorney, Baltimore, MD, for plaintiff.

Gregg L. Bernstein, Gerard P. Martin, Steven F. Wrobel, Martin, Snyder & Bernstein, P.A., Baltimore, MD, for defendants.

## MEMORANDUM

DAVIS, District Judge.

## I. INTRODUCTION

Acting at the behest of the Secretary of the federal department of Housing and Urban Development ("the Secretary" or "HUD"), the United States instituted this civil action for damages against the former operator of an affordable housing project known as Riverdale Village Apartments (the "Project"), located in Baltimore County, Maryland, Richard M. Schlesinger, and several companies he owns or controls (hereafter "Schlesinger"). The Government generally alleges that over the ten years Schlesinger operated the Project with the benefit of HUD mortgage insurance, between 1985 and 1995, Schlesinger violated the express terms of his contractual undertakings ("the Regulatory Agreement" or "RA") and/or applicable HUD regulations.[1]

As his principal defense to the Government's claims, Schlesinger challenges the enforceability of the RA. In addition, he asserts the following general defenses: (1) that the Government's statutory claims fail because they are barred by the applicable statute of limitations, and its equitable claims are barred by the equitable defense of laches;[2] and that, in any event, (2) he acted reasonably and fully within the spirit of his contractual undertakings in the manner in which he operated the Project.

Discovery has concluded and the parties have filed cross motions for summary judgment. A hearing has been held. For the reasons set forth below, I shall enter an order granting in part and denying in part each party's motion for summary judgment. In particular, consistent with the following determinations made herein, the accompanying order: (1) declares the Regulatory Agreement valid and enforceable against Schlesinger; (2) dismisses all claims against defendants DBD Contracting, Topside Roofing Corporation, and Down–to–Earth Landscaping; (3) enters

---

1. The Government alleges claims in five counts: (1) statutory claims pursuant to 12 U.S.C. § 1715z–4a (Count I), which allows it to recover income or assets used in violation of an applicable regulatory agreement or regulation, and 31 U.S.C. § 3713 *et seq.*, (Count V), which gives the Government priority over parties that are insolvent and indebted to it; and, (2) common law breach of contract claims (Counts II & III) and an unjust enrichment claim (Count IV).

2. Somewhat related to Schlesinger's statute of limitations and laches defenses are the assertions that he has been prejudiced by the Government's purported eight-year delay in bringing this action, because (i) HUD regulations only require Project owners to keep records for three years, and (ii) he doesn't have the records the Government is seeking because it is not normal for contractors to submit invoices submitted by subcontractors to the customer. These arguments are discussed as they relate to specific claims below.

judgment in favor of the Government on claim 2 of Count II (the $125,000 Stamford loan transaction claim); (4) enters judgment in favor of the Government on claim 3 of Count II (the $17,858 in miscellaneous expenditures claim); (5) enters judgment in favor of the Government on claim 1 of Count II (the $42,335.19 Topside transaction respecting expenditures made to repair a shopping center roof); (6) enters judgment in favor of Schlesinger on that portion of claim 3 of Count II related to an expenditure of $3500 for a tax audit; (7) declares that Schlesinger may not defend the Government's claims on the basis that his use of "Identity–of–Interest" firms was justified; (8) declares that Schlesinger violated his contractual undertakings by failing to maintain the Project in good repair; (9) dismisses the Government's unjust enrichment claim; (10) declares that the Government's Priority Statute claim is limited to payments made by Schlesinger after February 13, 1995.

## II. SUMMARY JUDGMENT STANDARDS

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *See Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987).

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *Taft Broadcasting Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 45 n. 3 (4th Cir.1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment—even where ... both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985).

The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.,* 627 F.Supp. 170, 172 (D.Md. 1985) (quoting Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* 2d § 2720). *See also Federal Sav. & Loan Ins. Corp. v. Heidrick,* 774 F.Supp. 352, 356 (D.Md. 1991). "[C]ross-motions for summary

judgment do not automatically empower the court to dispense with the determination whether questions of material fact exist." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir.), *cert. denied*, 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987). Both motions may be denied. *See Shook v. United States*, 713 F.2d 662, 665 (11th Cir.1983).

"[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil & Gas, Inc. v. Appleman*, 380 F.2d 323, 325 (10th Cir.1967). *See also McKenzie v. Sawyer*, 684 F.2d 62, 68 n. 3 (D.C.Cir.1982) (stating that "neither party waives the right to a full trial on the merits by filing its own motion"). However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Shook*, 713 F.2d at 665.

## III. THE 1985 HUD–INSURED REFINANCING

Schlesinger was a real estate developer and the general partner of Riverdale Village Company ("Riverdale"). Riverdale was the owner of the now-demolished Project.[3] Schlesinger, through Riverdale, acquired the Project in the 1970s.

On December 17, 1985, Riverdale secured refinancing of the Project through a private mortgage loan from DRG Funding Corporation ("DRG") in the amount of $5,683,900. Pursuant to the HUD mortgage coinsurance program for multi-family rental housing units in operation at the time, HUD endorsed the mortgage, providing mortgage insurance. Thus, in exchange for its agreement to provide mortgage insurance for the Project, HUD required Riverdale and DRG to execute a standard Regulatory Agreement (the "RA"), the principal instrument of HUD's regulatory control over mortgagors and lenders participating in HUD mortgage insurance programs.[4] The RA was executed contemporaneously with the Note and Mortgage (the "Project Mortgage") and its terms were incorporated into the deed of trust.

The parties do not dispute that over the relevant ten-year span, between 1985 and 1995, the Project was greatly in need of significant maintenance and repair. They do dispute the bona fides of Schlesinger's efforts to make repairs and otherwise maintain the Project as he was required to do under the terms of the RA. It is undisputed that, in attempting to meet his repair and maintenance obligations, Schlesinger contracted for services provided by firms in which he held an interest, so called Identity–of–Interest Firms ("IOIFs").[5] In large measure, it is the

---

**3.** Built in 1948, the Project was a multifamily housing project with 542 dwelling units in a 25–building complex.

**4.** The obligations imposed by the RA on the mortgagor can be best understood as a reduction into a single document of the obligations imposed on mortgagors by the collection of HUD's requirements as set forth in applicable regulations and administrative handbooks. *See, e.g.*, 24 C.F.R. Parts 207 & 255.

**5.** Schlesinger, through Riverdale, hired Ceebraid–Signal Management (formerly Schlesinger Management Corporation) ("Ceebraid") as the management agent for the Project and executed a management agreement to that effect as required by the Secretary's regulations. Ceebraid, in turn, hired Topside Roofing (formerly Balbec Roofing) ("Topside") to perform roof repairs and gutter maintenance services for the Project, DBD Contracting ("DBD") to perform painting and other maintenance services for the Project, and Down–to–Earth Landscaping ("DTE") to perform landscaping services for the Project. Each of these entities is identified as an "identity-of-

lack of documentation required by the RA evidencing the reasonableness of the payments made by Schlesinger to the IOIFs, and the Government's consequent effort to recover the value of those undocumented payments, that lie at the heart of this case.

There is no dispute that the Project Mortgage fell into default as of December 1992; Schlesinger made no mortgage payments thereafter. Following a series of assignments of the Project Mortgage, HUD became the ultimate assignee in January 1995.[6] In June 1995, HUD settled insurance claims of approximately $5,406,-644.44. HUD foreclosed on the Project in September 1996.

## IV. HUD'S MORTGAGE INSURANCE PROGRAMS

The Government's claims are best understood after a brief summary of the statutory and regulatory setting in which they have arisen. In general, Section 207 of the National Housing Act (the "NHA"), *see generally* 12 U.S.C.A. §§ 1707 – 1715z–20 (West 1989 & 1999 Supp.), authorizes HUD to fully insure the repayment of mortgage loans made by private lenders for the purchase, rehabilitation or refinancing of various types of real estate. *See, e.g., id.* at § 1709 (generally authorizing the Secretary to insure mortgages for residential real estate properties); *id.* at § 1713 (authorizing the Secretary to insure mortgages for rental housing); *see also DRG Funding Corp. v. Secretary of Dep't of Hous. & Urban Dev.*, 898 F.2d 205, 206–07 (D.D.C.1990); *Housing Study Group v. Kemp*, 732 F.Supp. 180, 181–82 (D.D.C.1990). As it relates to residential real estate, the mortgage insurance program was intended to "facilitate particularly the production of rental accommodations, at reasonable rents, of design and

size suitable for family living." 12 U.S.C. § 1713(b)(2). With that purpose in mind, Congress directed the Secretary to "take action ... which will direct the benefits of mortgage insurance ... primarily to those projects which made adequate provision for families with children, and in which every effort has been made to achieve moderate rental charges." *Id.* Pursuant to this mandate the Secretary promulgated general and "full" insurance regulations under Section 207. These regulations are codified at 24 C.F.R. Part 207.

In 1974 Congress amended the NHA by adding Section 244, *see* 12 U.S.C. § 1715z–9, which generally authorized HUD to *coinsure* the repayment of mortgages made by private lenders on various types of residential real estate that were eligible for mortgage insurance under Section 207. *DRG Funding Corp.*, 898 F.2d at 206–07; *Housing Study Group*, 732 F.Supp. at 181–82; 24 C.F.R. § 255.1(a)(1) (1989) ("Section 244 [, 12 U.S.C. § 1915z–9,] authorizes [HUD] ... to insure, under a Coinsurance Contract, any Mortgage otherwise eligible for insurance under Title II [Section 207] of the [NHA].").

HUD was specifically authorized to coinsure mortgages for multifamily rental housing properties such as the one at issue here under Section 223(f) of the NHA. *See* 12 U.S.C. § 1715n(f) (authorizing the Secretary to insure mortgages executed in connection with the purchase or refinancing of multifamily housing projects); *id.* at 1715z–9(f) (authorizing the Secretary to coinsure mortgages on multifamily housing projects); 24 C.F.R. § 255.1(a)(2) (1989) ("Section 223(f) [, 12 U.S.C. § 1715n(f),] authorizes the Secretary to insure a mortgage executed in connection with the pur-

interest" firm within the contemplation of the RA.

**6.** DRG held the Mortgage from December 17, 1985 until November 25, 1987, when it assigned the Mortgage to Reilly Mortgage Group ("Reilly"). On February 12, 1990, Reilly assigned the Mortgage to the Govern-

ment National Mortgage Association ("GNMA"). On February 25, 1993, on behalf of GNMA, Mellon Mortgage Company assigned the Mortgage to Greystone Servicing Corporation ("Greystone"). On January 21, 1995, Greystone assigned the Mortgage to HUD.

chase or refinancing of an existing multi-family housing project.").

Under sections 244 and 223(f), respectively, 12 U.S.C. §§ 1715z–9(f) and 1715n(f), rather than assuming all of the risk associated with mortgage loans made by private lenders under Section 207, *id.* at § 1713, HUD would assume up to 90% of the risk with pre-approved private lenders and in exchange, the private lenders would: (a) assume not less than 10% of the mortgage insurance risk on any mortgage coinsured under the program; (b) pay a small mortgage insurance premium to HUD; and (c) assume active roles in processing potential mortgagor credit approvals, conducting and monitoring mortgaged property appraisals and inspections, facilitating HUD mortgage insurance commitment procedures, assisting with mortgaged property dispositions and performing other functions delegated by the Secretary. *See id.* at § 1715z–9(a), (f).

It is clear that Congress' intent in creating and HUD's purpose in administering the coinsurance program was to achieve the goals of the NHA by delegating many of the administrative responsibilities under the program to pre-approved private lenders, thereby reducing administrative delays common to the approval of such transactions. *See Housing Study Group,* 732 F.Supp. at 182 & n. 7. The delays had previously discouraged participation in HUD programs. *See id.* The mortgage coinsurance program's successes through the 1970s and early 1980s, *see id.* at 183 & n. 9, were eclipsed in the late 1980s when HUD discovered that pre-approved private lenders holding two of the largest portfolios of coinsured mortgages under the program—DRG Funding Corporation (the original private lender here) and York Associates, Inc.—had failed to adhere to acceptable underwriting practices and capital requirements and that many of their mortgagors had fallen into default. *See id.* &

n. 10 (noting that "$538 million (nearly 50%) of DRG's mortgage loans were in default"); *see also DRG Funding Corp.,* 898 F.2d at 205; *York Associates, Inc. v. Secretary of Dep't Hous. & Urban Dev.,* 820 F.Supp. 14 (D.D.C.1993).

HUD acknowledged that it was in part responsible for the failures of the coinsurance program because of its inability to monitor adequately the activities of its pre-approved private lenders. *See Housing Study Group,* 732 F.Supp. at 183. Reevaluation of the coinsurance program led HUD to issue a series of Coinsuring Lender Letters, policy statements and interim rules placing all pre-approved lenders under the program on probation, which had the effect of prohibiting lenders from making commitments to mortgage loans under the program without HUD pre-approval. *See id.* Shortly thereafter, following notice and comment under the Administrative Procedures Act, HUD promulgated regulations terminating the coinsurance program effective November 12, 1990. *See* 24 C.F.R. § 255.1 (1991) (terminating coinsurance program for multifamily rental housing under Section 244).

Pursuant to the regulations, HUD transferred previously *coinsured* mortgages to its *full insurance* program. *See* 24 C.F.R. § 255.827. As relevant here, in anticipation of the November 12, 1990 termination of the coinsurance program, the Project Mortgage was converted to full insurance on July 5, 1990, following Reilly's assignment of the Project Mortgage to GNMA.[7] The principal contention advanced by Schlesinger is that when HUD terminated the coinsurance program, his contractual obligations under the RA evaporated.

## V. STATUTE OF LIMITATIONS

Schlesinger first challenges this action by arguing that it is untimely and therefore barred by limitations.[8] Under the

---

7. *See supra* note 4 (explaining chain of assignments of the Project Mortgage).

8. Schlesinger has also asserted a laches defense. Since I conclude that the RA is valid and enforceable, and I thus dismiss the Government's alternative unjust enrichment claim, the merits of Schlesinger's laches defense need not be discussed.

controlling statutory scheme, the Government was required to file this action within six years "after the latest date that the Secretary discovers any use of project assets and income in violation of the regulatory agreement." *See* 12 U.S.C.A. § 1715z–4a(d); *cf.* 28 U.S.C. §§ 2415, 2416 (establishing general six-year period of limitations for government claims based on contract).

■ Schlesinger contends that the Government's claims accrued on January 5, 1990. If he is correct that the Government's claims accrued on that date, then the Government filed its complaint (on March 25, 1998) well outside the six year period. In asserting that the date of accrual was January 5, 1990, Schlesinger relies on a statement contained in a written evaluation of the Project prepared for HUD. In that evaluation, a HUD official reported that the Project could not be "rehabilitated." The contention that the Government's claims accrued based on this statement plainly lacks merit.

The full passage reads from which the statement is lifted reads as follows:

> Riverdale Village cannot be rehabilitated, if only because the units are so small and the unit mix is so weighted with efficiencies and one-bedrooms that the project would not be competitive with other projects in Essex. But the Essex market is not in collapse. *If prices were cut and units made more presentable, occupancy could be increased.* The management says it is going to try that.

(emphasis added). When read in context, the conclusion that the Project cannot be "rehabilitated" indicates that HUD believed that investing a significant amount of money to change the distribution of efficiencies (by converting them to one-, two-, or three-bedroom units, i.e., "rehabilitation") was inadvisable. This reading is consistent with HUD's later denial (in 1993) of an application by Schlesinger proposing a refinancing, "rehabilitation" and "repositioning" of the Project.

Furthermore, while the 1990 report documents the deteriorated condition of the Project, it also indicates unequivocally that HUD believed that Schlesinger was trying to make the units more "presentable." ("If prices were cut and units made more presentable, occupancy could be increased. *The management says it is going to try that.*") (emphasis added). Clearly, then, as the Government contends, HUD did not "discover" in 1990 that Schlesinger was not making an effort to "promptly complete necessary repairs and maintenance;" to the contrary, HUD reasonably believed he was still trying to meet his obligations under the RA.

As a matter of law, the Government only *discovered* the violations charged in this case (and thus its claims only accrued) in 1995, when, after HUD became the assignee of the Project Mortgage in February 1995, HUD began auditing the Project and found that adequate documentation was lacking to establish the reasonableness of the IOIF transactions and other Project expenditures. *See* 12 U.S.C.A. § 1715z–4a(d) (providing that claim may be brought from the *latest date* the Secretary *discovers* a violation). Accordingly, the institution of this action in March 1998 was well within the applicable statute of limitations.

## VI. ENFORCEABILITY OF THE REGULATORY AGREEMENT

Schlesinger's principal defense to this action presents purely a legal issue; his contention enjoys a striking facial attractiveness. The defense hinges on the correctness of his interpretation of a provision in the RA. That provision provides: "This Agreement will continue so long as the contract of coinsurance remains in force" (hereinafter "the termination clause"). Schlesinger argues that since "the contract of coinsurance" effectively terminated on July 5, 1990—the date HUD and GNMA amended the Project Mortgage and the deed of trust to reflect the Project Mortgage's transfer from the coinsurance program to HUD's full insurance program— the RA ceased to have effect on that date as well. Accordingly, he asserts, because by the terms of the termination clause the

RA ceased to have effect when HUD converted the Project Mortgage from the coinsured program to the fully-insured program on July 5, 1990, the RA was no longer applicable during the period in which he allegedly failed to maintain the Project in good repair and during which the undocumented payments to IOIFs were made.

The Government responds that the RA is fully enforceable against Schlesinger, notwithstanding the transfer of the Project Mortgage from the coinsurance program to the full insurance program. In full context, the termination clause reads as follows:

> In *return for the Secretary's endorsement for mortgage insurance* of the Note identified above and to comply with the requirements of the National Housing Act and the regulations and administrative requirements adopted by the Secretary pursuant thereto, *the Owner agrees to abide by the provisions of this Agreement.* This Agreement will continue so long as the contract for coinsurance remains in force.

RA at 1 (emphasis added). The Government contends that, when the termination clause is understood in its proper context, it must be deemed ambiguous as a matter of law. The Government further contends that proper resolution of the ambiguous meaning of the termination clause in light of the purposes and goals of the NHA discloses that Schlesinger's interpretation is unreasonable and therefore should be rejected.

I am persuaded that the Government has the better argument in respect to the parties' dispute over the interpretation of the RA. For the reasons set forth below, I conclude that the RA is fully enforceable against Schlesinger notwithstanding the conversion of the Project Mortgage from HUD's coinsurance program to its full insurance program.

## A. Federal Common Law Applies in this Case

Since, undeniably, the parties' rights and obligations under the RA involves pervasive federal interests, federal common law governs the RA's interpretation. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) (applying federal common law to claims arising under the Small Business Administration and Farmer's Home Administration lending programs, stating, "[t]his Court has consistently held that federal law governs questions involving the rights of the United States arising under nationwide federal programs") (citing *Clearfield Trust Co. v. United States,* 318 U.S. 363, 366–67, 63 S.Ct. 573, 87 L.Ed. 838 (1943)); *Caudill v. Blue Cross & Blue Shield of N.C.,* 999 F.2d 74, 78–79 (4th Cir.1993) ("[F]ederal common law governs the duties and obligations of the federal government under contracts to which it is a party.") (citing *Clearfield Trust Co.*). State law may be used if it is not in conflict with federal common law and does not "frustrate specific policy objectives of federal legislation." *Caudill,* 999 F.2d at 78 (citing *Boyle v. United Tech. Corp.,* 487 U.S. 500, 507–08, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988)).

## B. The RA's Termination Clause Is Ambiguous

Schlesinger, urging a stark "plain meaning" approach, would have me apply the single sentence comprising the termination clause literally and conclude that, all other considerations aside and all other provisions of the RA (and its underlying regulatory pedigree) notwithstanding, HUD's discontinuation of the coinsurance program and transfer of the Project Mortgage to the full insurance program relieved him of his obligations under the RA, thus depriving the Government of its right of action. One court has adopted the approach urged by Schlesinger here in a case, like this one, in which the Government sued to enforce an RA against a mortgagor under the coin-

surance program. *See United States v. David*, 1998 WL 351693 (E.D.Pa. June 30, 1998); *United States v. David*, 1998 WL 709292 (E.D.Pa. October 7, 1998) (denying motion for reconsideration). I am persuaded, however, that the court in *David* erred in failing to conclude that the termination clause was not ambiguous. *See* 1998 WL 351693 at *1–2.

■ Viewed in proper context, the termination clause is immediately preceded by language—and is, more generally, contained within a document—which seriously undermines the erstwhile "plain" interpretation put forth by Schlesinger. This language ("[i]n return for the Secretary's endorsement for mortgage insurance of the Note identified above and to comply with the requirements of the National Housing Act and the regulations and administrative requirements adopted by the Secretary pursuant thereto, the Owner agrees to abide by the provisions of this Agreement") and context suggest (as discussed in detail below) that it is not the continued existence of *the contract of coinsurance* that is critical to the continuation of Schlesinger's obligations under the RA, as Schlesinger argues; rather, it is the continued existence of the Secretary's endorsement for mortgage insurance that is the critical fact obliging Schlesinger to comply with the RA. Thus, the Government's proposed interpretation is a reasonable one that cannot be rejected summarily.[9]

The proper approach to the interpretation of ambiguous contract terms under federal common law was recently and succinctly set forth by the United States Court of Appeals for the Federal Circuit:

> When a contract is susceptible to more than one reasonable interpretation, it contains an ambiguity. *See Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed.Cir.1992). To show an ambiguity it is not enough that the parties differ in

their respective interpretations of a contract term. *See Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1578 (Fed.Cir.1993). Rather, both interpretations must fall within a "zone of reasonableness." *See WPC Enters., Inc. v. United States*, 163 Ct.Cl. 1, 323 F.2d 874, 876 (1963). If this court interprets the contract and detects an ambiguity, it next determines whether that ambiguity is patent. *See Newsom v. United States*, 230 Ct.Cl. 301, 676 F.2d 647, 649–50 (1982). The doctrine of patent ambiguity is an exception to the general rule of *contra proferentem* which construes an ambiguity against the drafter ....; *Sturm v. United States*, 190 Ct.Cl. 691, 421 F.2d 723 (1970). An ambiguity is patent if "so glaring as to raise a duty to inquire[.]" *Newsom*, 676 F.2d at 650. If an ambiguity is not patent but latent, this court enforces the general rule. *See Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed. Cir.1988).

*Metric Constructors, Inc. v. National Aeronautics and Space Admin.*, 169 F.3d 747, 751 (Fed.Cir.1999).

■ Since I have determined that the termination clause is ambiguous, in order to resolve the dispute between the parties I must first determine whether the ambiguity is patent or latent. Second, if the ambiguity is not patent but latent, I must determine whether Schlesinger's interpretation of the disputed clause is reasonable. *Id.; and see Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed. Cir.1988) (citing *United States v. Turner Constr. Co.*, 819 F.2d 283 (Fed.Cir.1987)). If Schlesinger's interpretation is reasonable, then I must accept it and reject the interpretation of the Government—the party that drafted the ambiguous provision.

*Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan*, 3 F.3d 994, 999 (7th Cir.1993) (citation omitted), *aff'd*, 513 U.S. 414, 115 S.Ct. 981, 130 L.Ed.2d 932 (1995).

---

**9.** "[A]mbiguous language (intrinsic ambiguity) or an unexpected application of language that appears clear in its linguistic context (extrinsic ambiguity) may pose problems...."

442

## 1. The Ambiguity In The Termination Clause Is Not Patent

An ambiguity is patent where, at the time of contracting, it is so "glaring as to raise a duty to inquire [on the part of the party contracting with the government]." *Fort Vancouver*, 860 F.2d at 414 (citing *Turner*, 819 F.2d at 286); *Newsom v. United States*, 230 Ct.Cl. 301, 676 F.2d 647, 650 (1982). When a patent ambiguity exists the duty of inquiry arises "regardless of the reasonableness vel non of [the nondrafter's] interpretation." *Newsom*, 676 F.2d at 650 (citing *Mountain Home Contractors v. United States*, 192 Ct.Cl. 16, 425 F.2d 1260, 1263 (1970)). This doctrine protects the government from parties with whom it contracts by requiring that ambiguities be raised before the parties become bound, thus avoiding costly litigation after the fact. *See Newsom*, 676 F.2d at 648 (citing *Beacon Constr. Co. v. United States*, 161 Ct.Cl. 1, 314 F.2d 501, 504 (1963)). Therefore, when presented with an "obvious omission, inconsistency, or discrepancy of significance, [the nondrafter] must consult the Government's representatives if he intends to bridge the crevasse in his own favor." *Beacon Constr. Co.*, 161 Ct.Cl. 1, 314 F.2d 501, 504. Failing to take such action will bar the requested relief. *See id.*

Here, it is quite apparent that at the time Schlesinger entered into the RA, the disputed ambiguity in the RA was not patent. At the time the RA was executed in 1985, neither HUD nor Schlesinger had any premonition of the impending implosion of the HUD multifamily coinsurance program that occurred between 1988 and 1990. Equally important for present purposes, it would have been quite apparent to the parties that even upon the termination of the HUD multifamily coinsurance program in 1990 and the concomitant suspension of HUD's contracts for coinsurance with private lenders, HUD would continue its mortgage insurance obligations to the Project.

Since neither of these eventualities was evident at the time of contracting in 1985, and as a result, the abstruseness of the termination clause was not readily apparent at that time, I conclude that the ambiguity inherent in the termination clause is not patent. Moreover, since one who contracts with the Government is only obligated to bring to the Government's attention "major discrepancies or errors which they detect ... [and] are not expected to exercise clairvoyance in spotting hidden ambiguities in the ... documents," *Mountain Home*, 425 F.2d at 1264 (citing *Blount Bros. Constr. Co. v. United States*, 171 Ct.Cl. 478, 346 F.2d 962, 973 (1965)), Schlesinger would not have been obligated to bring such concerns about the potential demise of the coinsurance program to the Government's attention even if they had occurred to him back in 1985.

## 2. The Ambiguity In The Termination Clause Is Latent and Schlesinger's Interpretation Is Unreasonable

Having concluded that the ambiguity is not patent but latent, I must next "examine whether the interpretation of the contract by the party that did not write it [is] reasonable." *Fort Vancouver*, 860 F.2d at 414 (citing *Turner*, 819 F.2d 283). It is not enough that the parties differ in their respective interpretations of a contract term. *See Metric Constr., Inc.*, 169 F.3d at 751; *Community Heating & Plumbing Co.*, 987 F.2d at 1578; *Hills Materials Co.*, 982 F.2d at 516. Rather, Schlesinger's interpretation must fall within a "zone of reasonableness." *See Metric Constr.*, 169 F.3d at 751; *WPC Enters., Inc.*, 323 F.2d at 876. If the asserted interpretation is reasonable, under the rule of *contra proferentum*, the ambiguity must be construed against the drafter, here the Government. *See Metric Constr.*, 169 F.3d at 751; *Fort Vancouver*, 860 F.2d at 414 (citing *Turner*, 819 F.2d at 286).

The Government relies on the following factors in support of its interpretation as the only reasonable interpretation of the termination provision: (1) HUD's role in facilitating and effectuating the Congressional and public policy objectives

of the NHA by regulating private lenders and project owners who benefit from mortgage insurance; and (2) the terms of HUD mortgage insurance regulatory provisions which run counter to the interpretation of the RA put forth by Schlesinger. *See Metric Constr.*, 169 F.3d at 752 ("The context and intention [of the contracting parties] are more meaningful than the dictionary definition.") (citing *Rice v. United States*, 192 Ct.Cl. 903, 428 F.2d 1311, 1314 (1970); *Corman v. United States*, 26 Cl.Ct. 1011, 1015 (1992)); *General Eng'g & Machine Works v. O'Keefe*, 991 F.2d 775, 780 (Fed.Cir.1993) ("Federal regulations which are based upon a grant of statutory authority 'have the force and effect of law, and, if they are applicable, they must be deemed terms of the contract even if not specifically set out therein, knowledge of which is charged to the contractor.'") (citing *De Matteo Constr. Co. v. United States*, 220 Ct.Cl. 579, 600 F.2d 1384, 1391 (1979), and *Condec Corp. v. United States*, 177 Ct.Cl. 958, 369 F.2d 753, 757–58 (1966)). I agree with the Government that consideration of these appropriate factors compels rejection of Schlesinger's proposed interpretation of the termination clause. I explain.

First, it should be recalled that the RA was an agreement involving three parties: HUD, Schlesinger, and DRG.[10] As a pre-approved coinsuring lender under the HUD coinsurance program, DRG was authorized to enforce the RA as a surrogate for the Secretary. *See* 12 U.S.C. § 1715z–9(a)(2) (enabling the Secretary to authorize pre-approved lenders to conduct inspections of and monitor HUD-insured mortgaged property); RA at 16, ¶ C.1 (providing that "[i]f the Owner violates any provisions of this Agreement, the Mortgagee or Secretary may send ... written notice of such violation.... If such violation is not corrected to the satisfaction of the Mortgagee or the Secretary ..., the Mortgagee or Secretary ... may initiate the following actions").

Not surprisingly, Schlesinger has downplayed the significance of DRG's role in the arrangement established by the RA. Because the RA was an agreement between three parties, only two of which are before this court, the terms of the RA must be closely scrutinized in order to determine whether the disputed terms apply generally to all parties to the RA, or particularly to some parties and not others. Keeping DRG's role in the coinsurance program in mind will assist in determining the intention of the parties as it relates to the ambiguous paragraph.

Second, it is clear that the RA did not limit the Secretary's authority to regulate Schlesinger directly. The contract for coinsurance is the "agreement between the lender and the Commissioner to coinsure a Mortgage under [24 C.F.R. Part 255]." 24 C.F.R. § 255.2 (1989). As discussed above in connection with the general background of the coinsurance program, the contract for coinsurance is the means by which the Secretary regulates private coinsuring lenders, while at the same time authorizing those lenders to regulate participating project owners whose mortgages are insured pursuant to 12 U.S.C. § 1715z–9(a).

The contract of coinsurance is evidenced by the HUD representative's endorsement of the Project Note. *See* 24 C.F.R. § 255.2. Its terms are the provisions codified by the Secretary at 24 C.F.R. Part 255. *See id.* (stating that the contract for coinsurance "includes the terms, conditions, and provisions of [24 C.F.R. Part 255]").[11]

---

**10.** DRG was the initial mortgagee under the RA. *As detailed in note 6, supra,* the Project Mortgage underwent a series of assignments between 1985 and 1995, with HUD becoming the ultimate assignee. In this discussion, for the sake of clarity, DRG is used to refer to the mortgagee and all subsequent assignees.

**11.** Subpart A, 24 C.F.R § 255.1–.4, establishes "General Provisions" governing the program. Subpart B, *id.* at § 255.101–.109, establishes "Lender Requirements." Subpart C, *id.* at § 255.201–.209, establishes "Program Requirements" for eligible projects. Subparts D and E, *id.* at §§ 255.301–.302, .401–407, establish "Processing and Commitment" and "Certification and Endorsement" guidelines participating lenders must follow to bind HUD for mortgages insured under the

Thus, an examination of the terms of the contract of coinsurance (as incorporated by regulation) reveals that the majority of Part 255's subparts pertain almost exclusively to the administrative requirements imposed upon coinsuring lenders. Among the provisions of the contract for coinsurance only two—subparts G and H—of the nine subparts within Part 255 speak to the obligations imposed upon Schlesinger as Project Owner. *See, e.g.,* 24 C.F.R. § 255.701 ("In order to be eligible for the benefit of insured financing under this part, the Mortgagor must agree to be regulated and restricted by the lender with respect to the ongoing operation of the project as set forth is this subpart [H]."); *id.* at § 255.505 (providing that the lender and mortgagor enter into a regulatory agreement requiring the mortgagor to comply with subparts G & H). Once the contract of coinsurance is made by the endorsement of the Secretary on the mortgage note, *see* 24 C.F.R. § 255.2 (stating that the contract for coinsurance is "evidenced by the Secretary's endorsement" of the project note), the lender is authorized, concurrently with the Secretary, to enforce the provisions of subparts G & H against the project owner.

The triggering events for the termination of the contract of coinsurance are found at 24 C.F.R. § 255.813. These events reflect the understanding that if the Secretary had unilaterally withdrawn from the insurance obligation because of the lender's malfeasance; if the Secretary had been released by the joint consent of the lender and project owner; or if the Secretary's insurance obligation had expired be-

cause the lender's participation in the financing of the Project had come to an end, the Secretary would no longer have the prerogative to regulate the lender and the lender would no longer have the derivative authority to regulate the project owner under the mortgage insurance program.[12]

Properly understood, then, the coinsurance program, as it was effectuated through the contract of coinsurance, was a *device* that enabled the Secretary to increase the availability of mortgage insurance for residential properties by enlisting the support of and delegating supervisory authority over project owners to pre-approved private lenders in the HUD mortgage insurance process. *See* 24 C.F.R. § 255.1(a), (b) (stating that the purpose and scope of the coinsurance regulations/contract for coinsurance terms in Part 255 were to "assist significantly in the conservation of neighborhoods and existing housing resources" by approving private lenders to "carry out (subject to monitoring) underwriting, commitment, property disposition and other functions that the [FHA] Commissioner approves"); *id.* at § 255.701 (providing that project owners "must agree to be regulated and restricted *by the lender* with respect to the ongoing operation of the project") (emphasis added); *id.* at 255.505 (requiring the lender and mortgagor to execute a regulatory agreement to comply with subparts G & H of Part 255).

Next, it is clear that the delegation of some authority to private lenders through the use of the contract of coinsurance did not purport to limit the Secretary's independent authority to regulate project own-

---

program. Subpart F, *id.* at § 255.501–.506, establishes basic "Mortgage and Closing" requirements. Subparts G and H, *id.* at 255.601, .701–.706, establish Mortgagor ownership structure and "Project Operation" requirements. Subpart I, *id.* at § 255.801–.828, establishes the "Contract Rights and Obligations" of the Mortgagee.

**12.** By its terms, the contract for coinsurance would terminate if the any of the following occurred: (1) the Project Mortgage was paid in full; (2) the lender acquired the Project

property and informed the Secretary that it was waiving any claim to insurance benefits; (3) the Project Owner redeemed or another party acquired the Project after foreclosure; (4) the Project Owner and the lender jointly requested to terminate the contract; (5) the lender committed fraud; or (6) the Commission terminated the contract for coinsurance following an improper assignment by the lender. *See* 24 C.F.R. § 255.813; *see also id.* at § 255.2 (stating that the contract for coinsurance "includes the terms, conditions, and provisions of [24 C.F.R Part 255]").

ers directly so long as the Secretary continued to have an insurance obligation. The retention of some regulatory authority by the Secretary pursuant to this condition is found within the general mortgagor eligibility requirements in 24 C.F.R. §§ 207.17–.21.

By Congressional mandate, the Secretary's authority to regulate project owners under the coinsurance program derived from the full insurance statutes and was exercised through the Secretary's regulations promulgated thereunder. *See* 12 U.S.C. § 1715z–9(a) (authorizing the Secretary to provide coinsurance for any "mortgage, advance or loan *otherwise eligible*" under any provision of the NHA mortgage insurance subchapter) (emphasis added); 24 C.F.R. § 255.1(c) (stating that "[t]his part provides for coinsurance of Mortgages under Section 207 of the [NHA]"). The fact that the Project Mortgage was insured through a coinsurance arrangement did not, as Schlesinger asserts, diminish the Secretary's regulatory authority pursuant to the general insurance provisions under which Schlesinger became eligible as a Mortgagor.

The coinsurance statute and regulations direct primary attention to lenders and do not contain eligibility requirements for mortgagors. To the extent the coinsurance regulations of Part 255 address mortgagor eligibility requirements, they only make reference to "mortgagors approved by the lender in accordance with standards" established by the Secretary. *See* 24 C.F.R. § 255.202.

The omission of eligibility requirements for mortgagors in the coinsurance regulations was not accidental. Since, in order to be eligible for coinsurance, a mortgagor must be eligible under one of the Secretary's full insurance programs, *see* 12 U.S.C. § 1715z–9(a), the Secretary's authority to provide insurance for a mortgage executed in connection with the refinancing of a multifamily housing project like the Project necessarily derived from 12 U.S.C. § 1713 (authorizing mortgage insurance for rental properties in general)

and § 1715n(f) (authorizing insurance for mortgages executed in connection with the refinancing of a multifamily housing project in particular).

Pursuant to 12 U.S.C. §§ 1713 and 1715n(f), the Secretary promulgated general eligibility and supervisory standards for all mortgagors of multifamily housing projects at 24 C.F.R. §§ 207.17–.21 (providing general requirements for mortgagors of multifamily housing projects). These are the relevant eligibility standards. *See id.* at 255.202 (providing that in order to be eligible for insurance covering the refinancing of an existing multifamily housing project, a mortgagor must be approved "in accordance with standards established by the [Secretary]"). They are, therefore, applicable to Schlesinger.

The eligibility provisions state that in order to be approved by the Secretary the mortgagor must be "restricted ... as to rents or sales, charges .. and methods of operation," *id.* at 207.17(a), "until the termination of all obligations by the [Secretary] under the insurance contract...." *Id.* The RA necessarily served the purpose of restricting Schlesinger in this case, as required by § 207.17(a).

The duration of the RA as the instrument by which the Secretary regulated the Project is addressed by a provision that accompanies 24 C.F.R. § 207.17(a). That regulation states that "[u]pon the termination of all obligations of the Commissioner under his contract of mortgage insurance, or any succeeding contract or agreement covering the mortgage obligation, all regulations and restrictions of the mortgagor shall cease ... and any regulatory agreement or contract shall terminate." *Id.* at § 207.18(c). This review of the eligibility requirements that Schlesinger was obligated to satisfy in order to qualify for mortgage insurance under the coinsurance program and under which Schlesinger was required to be governed for the duration of the period that the Secretary provided mortgage insurance for the Project establishes that he could

not have expected that the termination of the contract for coinsurance would extinguish the Secretary's authority to regulate his operation of the Project.

Next, the Government has established that the Amendment to the Deed to Trust Note/Mortgage Note made by HUD and GNMA on July 5, 1990 served as a succeeding contract for mortgage insurance and thereby continued the Secretary's mortgage insurance obligation through the conversion from co- to full insurance. The Secretary's authority to regulate Schlesinger under the RA was thereby continued pursuant to 24 C.F.R. §§ 207.17(a) and 207.18(c).

For present purposes, under 24 C.F.R. §§ 207.217(a) and 207.218(c), the relevant "contract for mortgage insurance" covering HUD's insurance obligation was, initially, the contract for coinsurance made between DRG and HUD when the Secretary's representative endorsed the Mortgage Note for insurance in 1985. That contract continued until the Project was converted from co- to full insurance on July 5, 1990 when, after a series of assignments, GNMA became the holder of the mortgage.

On July 5, 1990, HUD and GNMA executed an Amendment to the Mortgage Deed of Trust and Note, which explained that GNMA had "requested that the [FHA] Commissioner endorse the note for full insurance." The Commissioner endorsed the Note and the parties deleted all references to coinsurance in the Mortgage Note and Deed of Trust.

In my view, the Amendment can only be understood to be a "succeeding contract or agreement covering the mortgage obligation," 24 C.F.R. §§ 207.17(a), 207.18(c), since it served the purpose of continuing the Secretary's insurance obligation to the Project. Pursuant to 24 C.F.R. §§ 207.217(a) and 207.218(c), therefore, since the Secretary's insurance obligation under the contract for coinsurance remained in force following the July 5, 1990 conversion of the Project Mortgage from co- to full insurance, Schlesinger remained subject to the Secretary's regulatory control.

The factors discussed above reflect the contemporaneous understanding harbored by the parties at the time the RA was entered into. See General Eng'g, 991 F.2d 775, 780 (stating that regulations promulgated pursuant to a statutory scheme are incorporated into contracts entered into with the Government pursuant to that scheme and that contractors are charged with knowledge thereof). Therefore, for the reasons set forth below, I conclude that Schlesinger's interpretation of the paragraph at issue is unreasonable. Consequently, the rule of *contra proferentum* will not apply in this instance and whatever ambiguity arising from the disputed paragraph will *not* be construed against the Government. See Fort Vancouver, 860 F.2d at 414 ("Under the rule of *contra proferentum*, the contract is construed against the drafter if the interpretation advanced by the nondrafter is reasonable.") (citing Turner, 819 F.2d at 286). Accordingly, I will hold that the RA is valid and enforceable against Schlesinger.

Turning then to the first clause in the disputed paragraph, it reads: "In return for the Secretary's endorsement for mortgage insurance ... and to comply with the requirements of the National Housing Act and the regulations and administrative requirements adopted by the Secretary pursuant thereto, the Owner agrees to abide by the terms of this Agreement." RA at 1. This "in return for" clause, addressed solely to Schlesinger, when read in light of the "regulations and administrative requirements adopted by the Secretary," *id.*, see also General Eng'g, 991 F.2d at 780, reflects the parties' intent and understanding, also expressed at 24 C.F.R. § 207.17(a), that the Secretary would retain the authority to regulate Schlesinger "as to rents or sales, charges ... and methods of operation," *id.* at 207.17(a), as provided for in the subsequent provisions of the RA, "until the termination of all obligations by the [Secretary] under the insurance contract." *Id.*

Additionally, since the RA was the principal instrument of the Secretary's regulatory control over Schlesinger, when read in light of the "regulations and administrative requirements adopted by the Secretary," RA at 1; *see also General Eng'g*, 991 F.2d at 780, this clause reflects the parties' intent and understanding that the RA would terminate "[u]pon the termination of all obligations of the [Secretary] under his contract for mortgage insurance." 24 C.F.R. § 207.18(c).

The termination clause reads: "This Agreement will continue so long as the contract for coinsurance remains in force." Conceptually, the statutory and regulatory understanding reflected in this "so long as" clause is that DRG would lose its authority to regulate Schlesinger upon the termination of the contract for coinsurance because DRG was enabled by the contract for coinsurance to regulate Schlesinger (concurrently with HUD) as the Project Owner. *See General Eng'g*, 991 F.2d at 780; 12 U.S.C. § 1715z–9(a) (authorizing the Secretary to approve private lenders to carry out duties delegated under the mortgage insurance program); 24 C.F.R. § 255.701 (requiring the lender and the mortgagor to enter into a regulatory agreement).[13]

Since, consistently with 24 C.F.R. §§ 207.17(a) and 207.18(c), the paragraph as a whole establishes that the Secretary's authority to regulate Schlesinger endures until the Secretary's insurance obligation has expired, any reading of the termination clause that purports to extinguish the Secretary's authority while the Secretary retains an insurance obligation is contrary to the statutory and regulatory understanding of the effect of the RA and, necessarily, contravenes the contemporaneous understanding of the parties at the time the RA was executed. *See General Eng'g*, 991 F.2d at 780.

It is clear in light of the operation of the statutory and regulatory scheme that if the termination of the contract for coinsurance coincided with the termination of the Secretary's insurance obligation—as, presumably, most often is the case—Schlesinger's interpretation of the clause would be reasonable. However, given that in this instance the Secretary retained a mortgage insurance obligation when the contract for coinsurance was succeeded on July 5, 1990 by the Amendment to the Deed of Trust Note, the Secretary retained the authority to regulate Schlesinger "as to rents or sales, charges . . . and methods of operation," 24 C.F.R. § 207.17(a). And, because the insurance obligation was still extant, the regulatory agreement remained enforceable. *See id.* at § 207.18(c).

Finally, common sense exposes the unreasonableness of Schlesinger's interpretation. Manifestly, the *fundamental benefit of the bargain* was not, as Schlesinger's argument suggests, the *form of* the mortgage insurance provided by the Secretary but rather was the simple *fact* or the *existence of* mortgage insurance provided by the Secretary. Hence, that the *form* in which the mortgage insurance was initially provided by the Secretary changed from co- to full insurance did not alter the basis of that bargain: the Secretary continued to provide mortgage insurance; according-

---

**13.** Other courts have not hesitated under appropriate circumstances to "interpret" the seemingly unambiguous phrase "so long as" by according the phrase's linguistic and contextual environment a role to play in discerning the meaning of the text in which the phrase appears. *See Country World Casinos, Inc. v. Tommyknocker Casino Corp.*, 181 F.3d 1146, 1150 (10th Cir.1999) (provision in deed of trust note providing for accrual of interest "for so long as there exists no default" must be read in light of default provisions contained in note; default by party to note not covered by note's default provisions does not suspend accrual of interest); *State v. Raitz*, 63 Haw. 64, 621 P.2d 352, 358–59 (1980) (statute authorizing detention of person found incompetent to stand trial "for so long as such unfitness shall endure" interpreted, in context, not to authorize detention for life, court noting that " 'where literalness may strangle meaning,' we need not confine ourselves to [statute's] bare words") (quoting *Lynch v. Overholser*, 369 U.S. 705, 710, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962)).

ly, Schlesinger remained bound by the RA. He was not free to walk away from his obligations. Indeed, this common sense approach is reflected throughout Schlesinger's opposition to the initiation of debarment proceedings against him by HUD. *See generally* Exhibit II to Government's Memorandum in Support of Summary Judgment (Opposition to Notice of Proposed Debarment of Richard Schlesinger Received April 9, 1997). Any reading of the clause contrary to that understanding is tortured and strains both credulity and common sense.

Based on the above analysis, therefore, I am persuaded that Schlesinger's reading of the termination clause is unreasonable because to accept it would render the paragraph of which it is a part, as well as the mortgage insurance regulatory scheme itself, "inexplicable, inoperative, void, insignificant, meaningless, superfluous, [and would] achieve[ ] a weird and whimsical result." *State of Arizona By and Through Arizona Dept. of Trans. v. United States,* 216 Ct.Cl. 221, 575 F.2d 855, 863 (1978) (citing *ITT Arctic Serv. Inc. v. United States,* 207 Ct.Cl. 743, 524 F.2d 680, 683 (1975)); *see also Northrop Grumman Corp. v. Goldin,* 136 F.3d 1479, 1483 (Fed. Cir.1998) (admonishing that the court "must construe a contract so as 'to effectuate its spirit and purpose' and to give 'reasonable meaning to all of its parts' ")

(citation omitted). Accordingly, the latent ambiguity surrounding the termination clause will not be construed against the Government, *see Fort Vancouver,* 860 F.2d at 414, and, as a matter of law, the RA has continued validity and is fully enforceable against Schlesinger.[14]

Because I hold the RA valid and enforceable against Schlesinger I will dismiss Count IV of the Complaint, the Government's unjust enrichment claim. *See Lisbon Square v. United States,* 856 F.Supp. 482, 495 (E.D.Wis.1994) ("The parties in this case entered into an enforceable agreement upon which the defendants are entitled to recover double damages under § 1715z–4a. Thus, additional recovery for unjust enrichment based on quantum meruit is not warranted, and shall not be granted by the Court.").

VII. ANALYSIS OF THE MERITS OF THE GOVERNMENT'S CLAIMS

A. Overview

Count I of the Complaint states four claims brought under 12 U.S.C. § 1715z–4a, each of which seeks to recover double the value of assets and income used in violation of the RA and applicable regulations. The Government really does not (and in candor, cannot) assert that services performed by the IOIFs were not necessary.[15] At least three inspection reports created for HUD and private lenders re-

---

**14.** Schlesinger also relies on an internal HUD memorandum in which a HUD official acknowledged that in some cases "HUD has questionable legal grounds to pursue civil remedies since the regulatory agreement terminates when the contract for coinsurance terminates." The Government has produced an affidavit by Gail W. Laster, General Counsel of HUD, who acknowledged that a "divergence of views did exist within [HUD]. However, after a review of the legal authority, then General Counsel Frank Keating concluded that the regulatory agreements continued in effect and could be enforced by HUD against a noncomplying mortgagor." In any event, the existence of the internal HUD memorandum is of only academic interest here.

**15.** Under the RA, an IOIF is defined as "any relationship which would give the Owner or

its Management Agent control or influence over the price paid to an individual or business supplying goods and/or services to the Project." RA at 2, ¶ A.3. An IOIF is considered to exist when:

(1) the Project Owner or Management Agent; or (2) any officer or director of the Project Owner or Management Agent; or (3) any person who directly or indirectly controls ten percent (10%) or more of the voting rights or directly or indirectly owns ten percent (10%) or more of the Project Owner or Management Agent; is also (1) the contractor, subcontractor or supplier; or (2) an officer or director of the contractor, subcontractor or supplier; or (3) a person who directly or indirectly controls ten percent (10%) or more of the contractor's, subcontractor's or supplier's voting rights or directly or indirectly owns ten percent

veal that the services provided by the IOIFs were deemed necessary to keep the Project in good repair.

The Government's true complaint is with Schlesinger's lack of documentation showing that the expenditures made to IOIFs for repair services provided for the Project were "reasonable." The requirement of reasonableness of expenditures is provided for expressly in the RA, which requires that when dealing with IOIFs, Schlesinger was obligated to demonstrate by adequate documentation that "the charges levied by those [IOIFs] [were] not in excess of the costs that would be incurred in making arms-length purchases on the open market." RA at ¶ B.7.d. The RA further requires project owners to "[s]olicit oral or written cost estimates as necessary to assure compliance with the provisions of this paragraph [7] and document the reasons for selecting other than the lowest estimate. Maintain [sic] copies of such documentation and make such documentation available for inspection...." *Id.* at ¶ B.7.g.

As to the first claim of Count I, the Government alleges that Schlesinger wrongfully distributed "$521,580.00 in Project funds to [IOIFs] without providing adequate documentation to show that such payments were reasonable in amount and for reasonable operating expenses and necessary repairs." Complaint at 11, ¶ 31. Specifically, the amounts the Government alleged the Project wrongfully distributed are as follows: $262,335.19 to Topside; $125,144.37 to DBD and $134,100.00 to DTE. As to the second claim of Count I, the Government alleges that Schlesinger "violated the terms of the RA and applicable regulations when [he] repaid an advance to Stamford Apartments Co., an [IOIF], in the amount of $125,000.00, during a time when the Project was not in a surplus cash position." *Id.* at ¶ 32. As to the third claim of Count I, the Government alleges that Schlesinger violated the terms of the RA by "failing to provide adequate

(10%) or more of the contractor, subcontractor, or supplier.

documentation to support the expenditure of $36,068.00 in Project funds." *Id.* at 12, ¶ 33. As to the fourth claim of Count I, the Government alleges that Schlesinger violated the RA by "failing to maintain the Project in good repair and condition." *Id.* at ¶ 34. Counts II and III of the Complaint repeat the claims asserted in Count I, but under the common law theory of breach of contract. *See id.* at 12–13, ¶¶ 38–40, 43.

Count IV of the Complaint states a claim under the common law theory of unjust enrichment. Since I have found the RA is valid and enforceable against Schlesinger it is dismissed. Count V of the Complaint states a claim under the Federal Priority Statute, 31 U.S.C. 3713 *et seq.*, which permits the Government to recover the extent of unpaid claims of the Government from an insolvent person who is indebted to the United States and who has committed an act of bankruptcy by making payments to a party other than the Government. *See id.* at 14–15, ¶ 49–51.

**B. Dismissal Of IOIF Defendants**

█ Before turning to the merits of the Government's claims, I will at the outset dismiss all claims against the defendants DBD Contracting ("DBD"), Topside Roofing Corporation, ("Topside") and Down–to–Earth Landscaping ("DTE"). Schlesinger correctly points out that each of these IOIFs should be dismissed as defendants. The Government brings this action under 12 U.S.C.A. § 1715z–4a (West Supp.1999), which permits the Attorney General to bring an action at the request of the Secretary of HUD to recover, in addition to attorneys fees and costs, double the value of "any assets or income used by any person in violation of (A) a regulatory agreement that applies to a multifamily project whose mortgage is insured or held by the Secretary under Title II of the National Housing Act ... or (D) any applicable regulation." *Id.*[16]

*Id.* at 2, ¶ A.3.a. There is no dispute that DBD, Topside and DTE are covered by this definition.

**16.** In relevant part the statute provides:

Since the Government has produced no evidence to show that DBD, Topside or DTE, which are IOIFs in relation to Schlesinger, ever held ownership interests in the owner of the Project, Riverdale, it has failed to show they come within the terms of 12 U.S.C. § 1715z–4a.[17] Moreover, since none of these IOIFs were parties to the RA, or otherwise were in privity with HUD, the Government has failed to establish a claim against any one or more of them under common law theories of breach of contract or unjust enrichment. Finally, since the Government has produced no evidence showing that any of these IOIFs controlled Project funds, there is no triable issue relating to whether DBD, Topside and DTE violated the Federal Priority Statute, 31 U.S.C. § 3713 *et seq.*, by making unauthorized payments to third parties while the Project was indebted to the Government. Accordingly, DBD, Topside and DTE will be dismissed.

### C. Claims For Which Summary Judgment Is Appropriate

After a thorough review of the record, I am persuaded that, for the reasons set forth below, with respect to the following

> The Secretary of [HUD] ... may request the Attorney General to bring an action in the United States district court to recover any assets or income used by any person in violation of (A) a regulatory agreement that applies to a multifamily project whose mortgage is insured or held by the Secretary under Title II of the National Housing Act ... or (D) any applicable regulation. 12 U.S.C.A. § 1715z–4a(a)(1) (West Supp. 1999). Respecting damages, the statute provides further:
> In any judgment favorable to the United States entered under this section, the Attorney General may recover double the value of the assets or income of the project that the court determines to have been used in violation of the regulatory agreement, or applicable regulation ..., plus all costs relating to the action, including, but not limited to reasonable attorney and auditing fees. *Id.* at 1715z–4a(c).

**17.** As defined under the statute, "any person" means

> any person or entity which owns a project, as identified in the regulatory agreement,

claims, there are no genuine issues of material fact and I will enter summary judgment as indicated.

**1. The $125,000 Stamford Loan Transaction**

The Government alleges that Schlesinger "repaid an advance to Stamford Apartments Co. [ ('Stamford') ], an [IOIF], in the amount of $125,000 during a time when the Project was not in a surplus cash position and when the payment imposed a financial hardship on the Project." Complaint at 11, ¶ 32.[18]

The uncontradicted evidence of record establishes that the Project borrowed funds from Stamford. Further, the record shows that the Project checks drawn to repay the advance made by Stamford to the Project were dated January 22, 1992 ($55,000) and February 5, 1992 ($70,000). The necessary predicate that the Project was not in a surplus cash position when the payments were made is established by the undisputed findings of a HUD–OIG auditor made pursuant to an audit of the Project accounts in 1996.

> including but not limited to any stockholder holding 25 percent or more interest of a corporation that owns the project; any beneficial owner under any business or trust; any officer, director or partner or an entity owning the project; and any heir, assignee, successor in interest, or agent of any owner. 12 U.S.C.A. § 1715z–4a(a)(2) (West Supp. 1999).

**18.** As defined in the RA, Surplus Cash is "any unrestricted cash remaining after the payment of (1) all sums currently due or required to be paid under the terms of any Mortgage or Note coinsured by the Secretary; (2) all amounts required to be deposited in the Reserve for Replacements; and (3) all obligations of the Project other than the coinsured Mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary. *See* RA at 3–4, ¶¶ A.9.a.(1)–(3); *see also id.* at ¶B.4.a (requiring that the Project Owner "make ... Distributions of cash or other assets of the Project only as authorized by this Agreement"); *see generally id.* at ¶B.4.a. (providing strict limitations on Project distributions).

■ The RA provides that expenditures of Project funds for other than reasonable operating expenses may be made only when the Project is in a surplus cash position. *See* RA at ¶¶ B.7.a, .c. Given that the undisputed evidence establishes that the Project was not in a surplus cash position when the Stamford loans were repaid, the only question to be decided is whether the repayment of owner advances constitutes a "reasonable operating expense" under the terms of the RA. In this determination, I am guided by persuasive case law which holds unequivocally that such repayments are not "reasonable operating expenses."

In general, when determining which expenditures are "reasonable operating expenses" and those that are not courts view those expenditures "arising from the everyday operation and maintenance of the project" as permissible. *United States v. Harvey*, 68 F.Supp.2d 1010, 1017–18 (S.D.Ind.1998) (citation omitted). Further, courts distinguish between those "payments made for the investors' benefit from those made for the benefit of the project." *Id.; accord In re RLA of Madison, Inc.*, 177 B.R. 78, 80 (Bankr.M.D.Tenn.1994). The distinction recognizes that the "National Housing Act was primarily intended to benefit individuals who live in inadequate housing, not commercial developers." *Harvey*, 68 F.Supp.2d at 1018 (citing *United States v. Winthrop Towers*, 628 F.2d 1028, 1036 (7th Cir.1980)); *see also M.B. Guran Co., Inc. v. City of Akron*, 546 F.2d 201, 204 (6th Cir.1976) (stating that "the class for whose especial benefit the [NHA] was enacted must be the persons who inhabit inadequate housing").

Cases addressing the repayment of owner advances under the relevant RA provisions and the administrative requirements hold that the repayment of an owner advance like the payment to Stamford is not a reasonable operating expense. *See Thompson v. United States*, 408 F.2d 1075, 1079–81 (8th Cir.1969) ("Neither ... the repayment of the bank loan, the proceeds of which were used to equip and furnish part of the premises for a private club, nor the *withdrawal of funds to reimburse any of the partners for prior advances* to the operating account constituted payment of reasonable expenses incidental to the operation and maintenance of the project.") (emphasis added); *Lisbon Square*, 856 F.Supp. at 494 (citing *Thompson*).

In response to the Government's showing, Schlesinger first argues that since the funds were held in security deposit trust accounts they were not part of the Project's assets. This position is contrary to the position taken by Schlesinger at his debarment hearing. There, in summarizing Schlesinger's position as it relates to this matter, the official noted that Schlesinger "admitt[ed] that security deposits were not properly segregated, but claim[s] that the funds were needed to fund operating deficits." This argument is, in addition, undercut by the express terms of the RA.

The RA provides that Surplus Cash comprises those funds remaining after "the segregation and recording of ... an amount equal to the Project's total liability for tenant security deposits." *See id.* at ¶ A.9.b.(2) (defining Surplus Cash). Thus, the RA's definition of Surplus Cash considers amounts dedicated for security deposits in the calculation. In addition, by virtue of the definition of Surplus Cash in the RA, once the liability for security deposits had been satisfied—and the RA does contemplate that security deposits be placed in a trust account, *see id.* at ¶ B.3.d—the terms of the RA indicate that any remaining cash automatically becomes subject to the restrictions applicable to Project funds, namely, committed to the required reserve for replacement and mortgage payments and all other Project obligations. *See id.* at ¶ A.9.a(1)–(3). Schlesinger's first argument, therefore, has no basis in the terms of the RA.

Schlesinger's alternative argument, presumably conceding that security deposits are part of the Project's assets, is that since the repayment of the loan was for the benefit of the tenants, it was a reason-

able operating expense. *See* Defendants' Reply Memo at 29 (citing *Arizona Oddfellow–Rebekah Hous., Inc. v. Department of Hous. & Urban Dev.*, 125 F.3d 771, 774 (9th Cir.1997)). Just as Schlesinger's first argument lacked sufficient basis in the terms of the RA, Schlesinger's second argument lacks basis in the law. *Arizona Oddfellow–Rebekah Hous., Inc.* addressed whether legal expenses incurred in advancing the Project's interests were reasonable operating expenses. *See id.* at 774. There is no language within *Arizona Oddfellow–Rebekah Hous., Inc.*'s discussion of the issue of legal fees that contradicts or calls into question *Thomspon's* holding that the repayment of owner advances do not constitute "reasonable operating expenses" under the terms of the RA inasmuch as they do not primarily benefit the tenants. *Compare id.* at 774 (citing *Thompson* and stating the "central principle [that] ... operating expenses ... must primarily 'benefit the project,' rather than the owner"), *with Thompson,* 408 F.2d at 1080 (holding that reimbursements to "any of the partners for prior advances to the operating account [did not] constitute[ ] payment of reasonable expenses incidental to the operation and maintenance of the project"). Consequently, *Thompson* and its progeny, not *Arizona Oddfellow–Rebekah Hous., Inc.,* govern the resolution of this issue and compel the conclusion that the repayment of owner advances are not "reasonable operating expenses" under the terms of the RA.

Therefore, in light of the undisputed evidence establishing that the Project repaid the $125,000 advance made by Stamford when the Project was in a non-surplus cash position, and concluding as I do that Schlesinger's arguments have no basis in the terms of the RA or in law, I conclude

that Schlesinger has breached the RA as it relates to the Stamford loan transaction and the Government is entitled to summary judgment on claim 2 of Count II, Complaint at 13, ¶ 39. Whether the Government should be awarded double damages, reasonable attorney's fees and auditing costs under 12 U.S.C. § 1715z–4a must be determined at trial.

**2. The $17,858 In Miscellaneous Expenditures**

The Government alleges that Schlesinger "fail[ed] to provide adequate documentation to support expenditure of [$21,148.00] in Project funds, as required under the terms of the RA." *Id.* at 12, ¶ 33.[19] These payments include the following amounts: $14,715 in payments which Schlesinger contends were comprised of thirty-three mortgage payments made on an adjoining shopping center that Schlesinger and HUD believed was part of the Project; $3,143 in payments which Schlesinger contends were made for the preparation of a feasibility application submitted to HUD proposing a rehabilitation of the Project; and $3,500 in payments which Schlesinger contends were made for auditing expenses related to the Project's 1994 and 1997 tax returns.

I am persuaded that the Government is entitled to judgment with respect to $17,858, and that Schlesinger is entitled to judgment as to the balance.

First, Schlesinger contends that $14,715 was allocated to mortgage payments made to a shopping center which adjoined the property and about which, documents produced by Schlesinger indicate there was some confusion between HUD and Schlesinger as to whether the shopping center was encumbered by the

**19.** In addition to requiring owners to expend Project funds only for "reasonable operating expenses," *see* RA at ¶ B.7a., c., the RA imposes the obligation on the Project Owner to "[e]stablish and maintain the books of the [Project] in accordance with the requirements of the Secretary.... Such books and accounts must be kept current and in such form as to

permit a speedy and effective audit ... [and] must be maintained for such periods of time as may be prescribed by the Secretary...." RA at 13, ¶ B.14.

The figure cited was originally calculated and alleged in the Complaint to be $36,068.00. It was subsequently reduced to $21,148.00 by the Government.

Project Mortgage. Ultimately, it was determined that the shopping center was not encumbered by the Project Mortgage.

That the thirty-three payments were made to service the shopping center mortgage is not disputed. Since there is adequate documentation to support the shopping center mortgage payments, the question to be determined is whether such payments can been considered "reasonable operating expenses" made for the benefit of the tenants under the terms of the RA. *See* RA at ¶¶ B.7.a, .c.; *Harvey,* 68 F.Supp.2d at 1017–18 (stating that expenses are reasonable if they primarily benefit the tenants, not the owner); *Thompson,* 408 F.2d at 1080 (same). I conclude that they cannot.

The NHA "was primarily intended to benefit individuals who live in inadequate housing, not commercial developers." *Harvey,* 68 F.Supp.2d at 1018; *Winthrop Towers,* 628 F.2d at 1029; *M.B. Guran Co.,* 546 F.2d at 204. As discussed above, the determination of whether operating expenses are reasonable is based on distinctions between whether the "payments [are] made for the investors' benefit . . . [or] for the benefit of the project," *Harvey,* 68 F.Supp.2d at 1018. Based on these considerations, it is clear that the payments made by Schlesinger to service the shopping center mortgage, especially since Schlesinger had altogether stopped servicing the Project Mortgage, are the kind of payments that are forbidden by the RA. The allocation of multifamily housing project funds to service a mortgage covering the commercial activities in an adjoining shopping center brands the expenditures as payments made for the investors' benefit.

Accepting Schlesinger's justification for these payments that the shopping center contributed some money to the Project's operating account does not change this conclusion. Schlesinger has argued that the payments were justified or that he should be entitled to an offset because the shopping center contributed approximately $326,569 to the Project. Conceptually, the

arrangement in which the shopping center contributed money to the Project and the Project serviced the shopping center mortgage may be analogized to an owner advance. Under case law reviewed above, such expenditures are not reasonable operating expenses within the terms of the RA. *See Thompson,* 408 F.2d at 1080 (holding that "the repayment of the bank loan, the proceeds of which were used to equip and furnish part of the premises for a private club . . . [did not] constitute[ ] payment of reasonable expenses incidental to the operation and maintenance of the project."); *Lisbon Square,* 856 F.Supp. at 494 (citing *Thompson*).

Therefore, I conclude that Schlesinger has failed to generate a genuine issue of material fact as to whether that $14,715 of Project funds used to service the shopping center mortgage were "reasonable operating expenses," and therefore that Schlesinger has breached the RA. *See* RA at ¶¶ B.7.a, .c. Accordingly, judgment in favor of the Government is appropriate in the amount of $14,715 on claim 3 of Count II.

Next, Schlesinger has produced documentation demonstrating that at least $1,539.62 of $3,143 in Project funds was paid to United Community and Housing Development Corporation ("UCHD") for the preparation of and expenses related to the feasibility application submitted by Schlesinger in late 1990 and which was ultimately rejected by HUD in 1993 ("the Application"). Schlesinger could not produce invoices covering the remaining $1,603.38.

■ Schlesinger does not produce any HUD guidelines supporting these expenditures but argues that the expenditures were "reasonable operating expenses" since they sought to develop a plan for the future of the Project. The question is whether the expenditures can be considered "reasonable operating expenses" under the RA. I conclude that they cannot.

The primary action proposed by the Application did not focus on the day-to-day

operation of the Project as a going concern. *See In the Matter of Tampa Bay Briarwood Assoc., Ltd.,* 118 B.R. 126, 127–28 (Bankr.M.D.Fla.1990) (citing *Thompson,* 408 F.2d at 1080). Moreover, the Application included property not only encumbered by HUD insured mortgage, but also included the adjoining parcel also owned by Schlesinger, "Riverdale Apartments," which was not insured by HUD. On this basis alone, the Application clearly should not be viewed as for the primary benefit of the tenants but for Schlesinger.

The Application and the evaluations clearly indicate also that the Application did not target the day-to-day painting, cleaning, replacements and repair needs inspectors of the Project had continually raised during periodic inspections of the Project. Instead of targeting the current day-to-day maintenance needs of the Project, the Application proposed that Schlesinger sell the Project and his uninsured property to UCHD. The Application proposed that, in turn, UCHD would obtain a new HUD-insured mortgage, thereby increasing HUD's insurance obligation from approximately $5 million to $40 million. With new money secured through an increased HUD-insured mortgage, rather than focusing on desperately needed repairs, upgrades and maintenance raised in periodic inspection reports, the Application sought to rehabilitate the Project by converting many of the one-bedroom units to two- and three-bedroom units in an attempt to reposition the Project more competitively in the local rental housing market.

Ultimately, the proposal made in the Application was rejected by HUD as a "very expensive repositioning scheme" because it failed to address the current maintenance and repair needs of the existing Project units and because it would cause an increase in rents for existing tenants in order to service the increased mortgage obligation. Instead of the proposed repositioning and rehabilitation, an analysis of the Application aptly noted that what the Project acutely required was a "capital grant to return the units to Housing Quali-

ty Standards" or "some degree of subsidy to lower the rents further," to give the Project a competitive rent advantage over nearby competing projects. The Application did not address these issues.

Based on the Application, it is clear that for the same reason the Application was rejected, i.e., because of its failure to address the maintenance and repair needs of the existing tenants, it cannot be viewed as having been primarily focused on the day-to-day operation of the Project as a going concern, the relevant test. *See Thompson,* 408 F.2d at 1079–81. Moreover, the fact that the Application placed such an emphasis on the "repositioning" principle that is so fundamental to commercial development supports the conclusion that the Application was made primarily for the investors' or the owner's benefit and not the benefit of the tenants. Finally, it remains a mystery as to why Project funds, as opposed to the funds of UCHD who was the party that would ultimately have to secure mortgage insurance from HUD, were used in this process.

I return to the fundamental proposition underlying the NHA: that the Act was "primarily intended to benefit individuals who live in inadequate housing, not commercial developers," *Harvey,* 68 F.Supp.2d at 1018; *Winthrop Towers,* 628 F.2d at 1036. Drawing all reasonable inferences in favor of Schlesinger, *Anderson,* 477 U.S. at 247, 106 S.Ct. 2505; *Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348, and in consideration of the analysis above and my review of the motions, memoranda, affidavits and exhibits, I conclude in light of *Thompson,* 408 F.2d at 1079–1081, *Harvey,* 68 F.Supp.2d at 1018, and *Winthrop Towers,* 628 F.2d at 1036, that Schlesinger has failed to generate a genuine issue of material fact as to whether the $3,143 of Project funds used to prepare the Application were permissible "reasonable operating expenses" under the terms of the RA. Since, as a matter of law, Schlesinger has breached the RA with respect the $3,143 charged to the Project for the preparation of the

Application, *see* RA at ¶¶ B.7.a, .c., judgment in favor of the Government is appropriate in the amount of $3,143 on claim 3 of Count II.

▮ In response to the Government's motion for summary judgment with respect to $3,500 in allegedly unaccounted for Project expenditures, Schlesinger has produced documentation establishing that the expenditure included two $1,750 payments in auditing fees made to the Project's management agent, Ceebraid. Specifically, the documentation produced by Schlesinger are receipts consisting of one-sentence letters from Ceebraid addressed to Riverdale reciting $1,750 "for preparation and filing of 1994 tax return, and preparation and completion of financial statements for the year ending December 31, 1994," and "for preparation, services rendered for the 1997 Year End Tax Return." Schlesinger has also demonstrated that reasonable auditing expenses are allowable under HUD guidelines, *see* HUD Handbook 4350.01 REV–1, ch. 7, at 7–31, ¶ 5–Guidance for Evaluating the Appropriateness of Project Expenses (providing that "[r]easonable fees for preparing any Federal, state or local tax return information require [sic] of the project account may be charged against the project account without regard to surplus cash computations"). In addition, Schlesinger has produced evidence establishing that the $1,750 charged to the Project by Ceebraid for tax years 1994 and 1997 was less than the $2,880 charged by an outside auditing firm for the 1990 tax year.

Since the Government's evidence on this issue is squarely contradicted by HUD Guidelines, *see* HUD Handbook 4350.01 REV–1, ch. 7, at 7–31, ¶ 5 (permitting Project funds to be used for reasonable auditing expenses), I am persuaded, in light of the documentation furnished by Schlesinger establishing the reasonableness of the auditing expenditures paid, that the Government has failed to generate a genuine issue of material fact as to whether Schlesinger breached the terms of the RA with respect to these payments. Accordingly,

partial summary judgment in favor of Schlesinger is appropriate to the extent of $3,500 of the amount claimed by the Governments in claim 3 of Count II, *see* Complaint at 13, ¶ 40, and claim 3 of Count I, *see id.* at 12. ¶ 33.

In summary, the net result of the foregoing analysis of the Government's claim that Schlesinger breached the RA with respect to $21,148 of unauthorized expenditures of Project funds, I find that Schlesinger breached the RA with respect to the $14,715 of Project funds paid to service the shopping center mortgage and for the $3,143 of Project funds paid to prepare the Feasibility Application for a total of $17,858 of the $21,148 claimed by the Government. Partial summary judgment in favor of the Government on claim 3 of Count II, *see* Complaint at 13, ¶ 40, will be entered.

By contrast, since the Government has failed to generate a genuine issue of material fact as to whether $3,500 paid by Schlesinger for auditing services breached the RA, partial summary judgment in favor of Schlesinger in the amount of $3,500 will be entered with respect to claim 3 in each of Counts I and II. *See* Complaint at 11, ¶ 32; *id.* at 13. ¶ 40.

3. The Use Of $42,335.19 In Project Funds To Repair The Adjoining Shopping Center Roofs

The Government alleges that Schlesinger violated the terms of the RA by making $262,335.19 ($175,000 for Project roof water treatment; $45,650 for Project porches; $36,875 for adjacent shopping center roof water treatment; and $5,460.19 unaccounted for) in payments to Topside without providing adequate documentation showing that these expenditures were necessary and reasonable operating expenses, *see* RA at ¶¶ B.7.a., .c, and were not in excess of the costs that would be incurred had he made an arms-length transaction on the open market, *see* RA at ¶ B.7.d.

▮ The evidence is undisputed that the payments were made to Topside be-

tween March and August 1990 and September 1994 and August 1995. For the same reasons cited above with respect to the mortgage payments made to service the shopping center mortgage, *see Harvey,* 68 F.Supp.2d at 1018; *Winthrop Towers,* 628 F.2d at 1036; *M.B. Guran Co.,* 546 F.2d at 204, I am constrained to the view that Schlesinger has failed to generate a genuine issue of material fact as to whether the Project funds used to repair the adjoining shopping center roofs can legitimately be considered to be "reasonable operating expenses" within the contemplation of the RA.

Evidence in the record clearly establishes that the shopping center parcel was not encumbered by the HUD-insured mortgage, Schlesinger's "mistaken" belief notwithstanding. *See Winthrop Towers,* 628 F.2d at 1036 (stating that commercial developers presumably possess the resources and sophistication to make agreements they will be able to live with). Since, I repeat, the NHA "was primarily intended to benefit individuals who live in inadequate housing, not commercial developers," *Harvey,* 68 F.Supp.2d at 1018, the expenses allocated to the shopping center cannot be considered "reasonable operating expenses" under the terms of the RA.[20]

Therefore, having drawn all reasonable inferences in favor of Schlesinger, *Anderson,* 477 U.S. at 247, 106 S.Ct. 2505; *Matsushita,* 475 U.S. at 587–88, 106 S.Ct.

1348, and in consideration of the analysis above and my review of the motions, memoranda, affidavits and exhibits, I conclude as a matter of law, in light of the applicable provision of the RA, *see id.* at ¶¶ B.7.a, .c., that Schlesinger has failed to generate a genuine issue of material fact as to whether the $42,335.19 for roof repair services for the adjoining shopping center of the $262,335.19 in Project funds paid to Topside were reasonable operating expense under the terms of the RA. *See* RA at ¶ B.7.d.

Accordingly, as a matter of law, Schlesinger has breached the RA and partial summary judgment in favor of the Government to the extent of $42,335.19 of the $262,335.19 claimed by the Government in claim 1 of Count II, *see* Complaint at 12, ¶ 33, is appropriate.

### 4. Keeping The Project In Good Repair

The Government alleges that Schlesinger failed to maintain the Project in good repair and condition in violation of the RA. *See* Complaint at 13, ¶ 43; RA at ¶ B.6. The RA affirmatively requires the Project Owner to "[m]aintain the [Project] in good repair and condition and promptly complete necessary repairs and maintenance as required by the Mortgagee." RA at ¶ B.6. For reasons set forth below, I am persuaded that Schlesinger has failed to

---

**20.** Even assuming that the shopping center was part of the mortgage, Schlesinger has produced no documentation creating a genuine issue of material fact that he only used Topside after determining that the cost of using Topside would not be in excess of the cost that would be incurred in an arms-length transaction made on the open-market. The only evidence produced by Schlesinger on this point is a declaration attested to by the Project's management agent between 1988 and 1994, Daniel Ruda. I cannot find in this statement any facts tending to "show affirmatively that [Mr. Ruda] is competent to testify," Fed.R.Civ.P 56(e); Fed.R.Evid. 602, as to whether the charges levied by Topside for the roofing repair work for the adjoining shopping center were reasonable. In particular, nothing in the declaration provides support for the conclusion that he has developed a particular expertise in assessing the reasonableness of costs for roofing repair work. The Ruda declaration cannot, therefore, be considered to be competent evidence establishing the reasonableness of the Topside payments.

In the absence of the Ruda declaration, Schlesinger has directed the court's attention to no other evidence which would tend to generate a genuine issue of material fact as to whether the charges imposed by Topside for the shopping center roof work were not in excess of those that would be incurred in an arms length transaction made on the open market. Summary judgment in the Government's favor would also be warranted on this basis.

generate a genuine issue of material fact with respect to this requirement.

At the time of the mortgage insurance transaction, in 1985, the Project was in "reasonably good condition." More than a total of $1 million of loan proceeds ($845,823) and released money from the reserve for replacements account ($180,00) were dedicated to further rehabilitate and maintain the Project between 1985 and 1989.

■ Schlesinger simply argues that given the condition of the project and its lack of marketability, essentially, he did the best he could.[21] Documentation produced by Schlesinger bears out the assertion that during the period he operated the Project the local rental market was in a slump and the Project could not be rehabilitated. However, the same documentation communicates the view that while the Project could not be "rehabilitated"—used as a term of art meaning "refurbishing," or "renovating" to reposition the Project in the rental market—it was not beyond redemption.

Schlesinger appears to suggest that the proposal set forth in the Application was the panacea for, and HUD's rejection of the Application was the cause of, the Project's deteriorated condition. HUD's review of the Application acknowledged the slow rental market, but characterized the Application as a "very expensive repositioning scheme," rather than one addressed to basic maintenance concerns. What the Project was in need of, which the Application did not address, was "some type of capital grant to return the units to Housing Quality Standards.... Absent

this type of support, competent management should be installed on the ... Project that will use project rents to return all units to rentable condition." *See* Memorandum dated November 18, 1992, re: Feasibility Review, Riverdale Village and Riverdale Apartments, Essex.

Inspection reports between 1990 and 1994 confirm that during the years prior to the rejection of the Application, Schlesinger did not conduct maintenance. Following the rejection of the Application, the reports indicate that rather than following up on suggestions to seek assistance for a modest capital grant or rent subsidy—as opposed to the additional $20 million in HUD-insured financing proposed in the Application—Schlesinger abdicated all responsibility in making the necessary repairs, causing occupancy to plummet.[22]

Schlesinger's contemptuous neglect of the physical condition of the Project is amply communicated in his response to a question about the action he took upon receipt of the inspection reports: "The letters were inane. The letters suggested that we should replace capital equipment from positive cash flow a year or more after I offered the deed to HUD. The letters were written by incompetents and meaningless." *See* Deposition of Richard Schlesinger, 53. Schlesinger continued to reveal his disregard for the "good repair" requirement in the RA by commenting that he received "letters as if the property was occupied and funding, not that the property was vacant and there was nobody. And the mortgage was in default for a year and a half, so one could not

---

21. In addition, Schlesinger seeks to evade responsibility for his poor management of the Project by shifting blame on the lack of HUD oversight and HUD's failure to foreclose on the Project during the existence of the HUD coinsurance program. Whether a private lender or HUD itself directly regulated Schlesinger is irrelevant to Schlesinger's contractual obligations under the RA. HUD's decision to institute foreclosure proceedings, or avail itself of any other remedy, is wholly discretionary. *See United States v. Beacon Terrace Mut. Homes, Inc.,* 594 F.Supp. 53, 56 (D.Md.1984) ("It is well settled that a decision

by HUD to foreclose on a federally insured mortgage is subject to only limited judicial review under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.,* § 706(2)(A).") (citing *United States v. Winthrop Towers,* 628 F.2d 1028 (7th Cir.1980)). Since Schlesinger has failed to make a sufficient showing of arbitrary and capricious behavior on the part of HUD, this defense is unavailable.

22. Inspection Reports disclose that the occupancy rate of the Project was 89.5% in 1991; 78% in 1992; 45% in 1993; and 23% in 1994.

seriously—one could not take those letters seriously." *Id.* Evidence to the contrary shows that tenants indeed still lived in the Project units when these reports were received.[23]

■ Schlesinger correctly asserts that a real estate developer is not strictly liable, as the Government seems to argue, for keeping the Project in good repair. *See Christopher Village, Ltd. Partnership v. Retsinas,* 190 F.3d 310, 317–18 (5th Cir. 1999) ("There is no statutory or regulatory basis for imposing on a conscientious low-income housing operator the risk of uncompensated dilapidation or deterioration; the federal government, not the private contractor, is charged with funding the public program."). It is clear, however, from the materials before the court that Schlesinger was *not* conscientious in the management of the Project. Therefore, even under the standard most solicitous of project owners set forth in *Christopher Village,* Schlesinger has not succeeded in generating a genuine issue of material fact with respect to the deteriorated condition of the Project.

In *Christopher Village,* as here, HUD cited the owner of a project funded and insured under Section 221(d)(3) of the NHA, for a regulatory agreement violation because of the owner's failure to maintain the project in good repair. *See Christopher Village,* 190 F.3d 310, 313. Like Schlesinger, the project owner attempted to explain the deteriorating conditions of the project by claiming that the rents were not sufficient to fund maintenance. *See id.* To increase revenue for maintenance and repair, the owner requested HUD to approve a rental increase. *See id.* The increase, since the owner had also entered into a Housing Assistance Payment contract under Section 8 of the NHA, *see* 42 U.S.C. § 1437f, would be absorbed by HUD through rent subsidies. *See Christopher Village,* 190 F.3d at 313. HUD denied the request, stating that it would only consider the request if the owner deposited $2 million in escrow for needed repairs

or face default. *See id.* The owner failed to do so, was declared by HUD to be in default and HUD initiated foreclosure proceedings. *See id.*

In ruling on the owner's claim for declaratory judgment that HUD acted arbitrarily and capriciously in denying the owner's request for a rent increase, requiring the owner to place $2 million in escrow for repairs and declaring the owner to be in default of the regulatory agreement, the court reviewed the NHA statutory and regulatory scheme and concluded that "[t]he regulatory scheme does not contemplate that property owners must bear the risk of maintaining properties based on insufficient rental revenues." *Id.* at 317. The court included the important caveat directly applicable to Schlesinger, however, that "HUD could understandably refuse to provide financial assistance to an owner that has misappropriated funds, mismanaged the property, taken a profit instead of maintaining the property, or been negligent in its management in some other regard." *Id.*

■ In contrast to the project owner in *Christopher Village* who "never misappropriated funds or squandered its revenues . . ., never received a profit . . . and appear[ed] to have applied all of its revenues to cover costs of operating and maintaining the property," *id.,* there is here ample "evidence that the property was mismanaged," *id.* As found above, Schlesinger dealt heavily with IOIFs without satisfying the RA requirements meant to protect both HUD and the Project tenants from mismanagement. Schlesinger failed to document that the use of IOIFs would not incur costs to the Project that would be in excess of costs incurred in arms-length transactions on made on the open market, *see* RA at ¶ B.7.d; failed to allocate all Project funds for *only* reasonable operating expenses when the Project was not in a surplus cash position, *see id.* at ¶¶ B.4.a, B.7.a.; and he failed to repay owner ad-

---

**23.** *See supra* note 22.

vances only in accordance with the Secretary's guidelines, *see id.* at B.3.b.

After reviewing, therefore, the motions, memoranda, affidavits and exhibits, and drawing all reasonable inferences in favor of Schlesinger, *Anderson,* 477 U.S. at 247, 106 S.Ct. 2505; *Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348, I conclude in light of the relevant terms of the RA, *see id.* at ¶¶ B.4.a, B.7.a, and in light of the standard set forth in *Christopher Village,* that Schlesinger has failed to generate a genuine issue of material fact relating to the Government's claim that he failed to maintain the Project in good repair, in breach of the RA. Summary judgment in favor of the Government on Count III, *see* Complaint at 14, ¶ 43, is appropriate.

### 5. The Federal Priority Statute Claim

The Government argues that Schlesinger committed "acts of bankruptcy" by making payments to parties other than the United States when the Project was insolvent and indebted to the Government. *See* 31 U.S.C. § 3713 *et seq.* In response, Schlesinger cites *United States v. Blumenfeld,* 128 B.R. 918, 928–29 (E.D.Pa.1991) ("GNMA is not entitled to priority under 31 U.S.C. § 3713. The federal priority statute 'may not be invoked by an agency which is not an integral part of the governmental mechanism ... [T]he existence of a debt owed the United States did not occur until ... GNMA assigned [the] defaulted note and mortgage to HUD.'") (citations omitted).

In light of *Blumenfeld,* the Government is forced to concede that Schlesinger was not indebted to the Government while GNMA was the holder of the Project Mortgage. Only after February 13, 1995, when GNMA assigned the Project Mortgage to HUD, did Schlesinger become indebted to the Government for Federal Priority Statute purposes. *See Blumenfeld,* 128 B.R. at 929.

Based on *Blumenfeld* and the materials presented by the parties, I find that the Government has failed to generate a genuine issue of material fact as to whether Schlesinger violated the Federal Priority Statute by making distributions of Project funds to parties other than the Government prior to February 13, 1995. Accordingly, summary judgment in favor of Schlesinger for all payments made before February 13, 1995 is appropriate on the Government's Count V. *See* Complaint at 14–15, ¶¶ 50–51.

### D. Claims For Which Summary Judgment Is Denied

In light of the foregoing, I will deny summary judgment for the remaining claims and defenses, but with the qualification that follows.

Briefly summarized, the claims and amounts for which summary judgment is denied are, with respect to Topside, the remaining $220,000 ($262,335.19 minus $42,335.19) of Project funds claimed by the Government in claim 1 of Count II to have been paid to Topside in violation of the RA, *see* Complaint at 12–13, ¶ 38, and claimed by the Government in claim 1 of Count I, to have been paid in violation of 12 U.S.C. § 1715z–4a, *see* Complaint at 11, ¶ 31.

With respect to DBD, the entirety of the $125,144.37 of Project funds claimed by the Government in claim 1 of Count II to have been paid in violation of the RA, *see* Complaint at 12–13, ¶ 38, and claimed by the Government in claim 1 of Count I to have been paid in violation of 12 U.S.C. § 1715z–4a, *see* Complaint at 11, ¶ 31.

With respect to DTE, the entirety of the $134,100.00 of Project funds claimed by the Government in claim 1 of Count II to have been paid in violation of the RA, *see* Complaint at 12–13, ¶ 38, and claimed by the Government in claim 1 of Count I to have been paid in violation of 12 U.S.C. § 1715z–4a, *see* Complaint at 11, ¶ 31.

I will permit these claims to be defended by Schlesinger based on the terms of the RA. Those terms require that the Project Owner purchase goods and services from IOIFs only if the charges levied are not in excess of the charges that would be in-

curred in arms-length transactions made on the open market. *See* RA at ¶ B.6.d. The RA also required that Project Owners "[s]olicit oral or written estimates as necessary to assure compliance with the provisions of this paragraph and document the reasons for selecting other than the lowest estimate. Maintain copies of such documentation...."; *see also* 12 U.S.C. § 1715z–4a ("For purposes of this section, a use of assets or income in violation of the regulatory agreement ... shall include any use for which the *documentation in the books and accounts does not establish* that the use was made for a reasonable operating expense or necessary for the repair of the Project....") (emphasis added).

Laced through Schlesinger's defense on the IOIF transactions is the argument that Schlesinger used IOIF's because by doing so he could delay payment to those IOIF's and ostensibly conserve resources for the Project. While Schlesinger's payment analyses of Project funds distributed to Topside, DBD and DTE do bear out, in some instances, years of payment delay, and while declarations of Schlesinger and Ruda support this theory, I am not going to allow it at trial.

Commercial developers like Schlesinger presumably possess the resources and sophistication to make agreements they will be able to live with. *See Harvey,* 68 F.Supp.2d 1010, 1017; *Winthrop Towers,* 628 F.2d at 1036. RA requirements relating to IOIF transactions are uncomplicated and are intended to protect both HUD and Project tenants from the kind of mismanagement at issue in this case. In choosing to use IOIF's to perform the management, maintenance, landscaping and repair services for the Project, Schlesinger voluntarily assumed the obligations imposed by the provisions cited.

Finally, Schlesinger has made much of the delay in bringing this suit, contending that he had been prejudiced because he no longer has the records to establish these costs. He has not, however, produced any evidence whatsoever accounting for or explaining why he has succeeded in producing all of the non-critical documents— checks, invoices and "payment analyses" to demonstrate the basis for the expenditures—but lacks the critical documents— the documentation required by the RA demonstrating that the IOIF costs were no more than those that would be incurred in arms-length transactions on the open market. I leave this anomaly for resolution at trial.

## VIII. CONCLUSION

For the reasons set forth herein, I shall grant in part, and deny in part, the parties' cross motions for summary judgment. An order and an interlocutory judgment follow.

## ORDER

In accordance with the foregoing Memorandum, it is this 10th day of March, 2000, by the United States District Court for the District of Maryland, ORDERED

(1) That Defendants' Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART; and it is further ORDERED

(2) That Plaintiff's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART; and it is further ORDERED

(3) That ALL CLAIMS AGAINST DEFENDANTS DBD CONTRACTING, TOPSIDE ROOFING CORPORATION, AND DOWN–TO–EARTH LANDSCAPING ARE DISMISSED WITH PREJUDICE; and it is further ORDERED

(4) That the Regulatory Agreement is valid and enforceable against defendant RICHARD M. SCHLESINGER; and it is further ORDERED

(5) That judgment shall be entered in favor of the Government on claim 2 of Count II for $125,000; and it is further ORDERED

(6) That judgment shall be entered in favor of the Government on claim 3 of

Count II for $17,858; and it is further ORDERED

(7) That judgment shall be entered in favor of the Government on claim 1 of Count II for $42,335.19; and it is further ORDERED

(8) That judgment is hereby entered in favor of defendant RICHARD M. SCHLESINGER claim 3 of Count II related to an expenditure of $3500 for a tax audit; and it is further ORDERED

(9) That defendant RICHARD M. SCHLESINGER may not defend the Government's claims on the basis that his use of "Identity–of–Interest" firms was justified; and it is further ORDERED

(10) That defendant RICHARD M. SCHLESINGER violated his contractual undertakings by failing to maintain the Project which is the subject of these proceedings in good repair; and it is further ORDERED

(11) That the Government's unjust enrichment claim IS DISMISSED WITH PREJUDICE; and it is further ORDERED

(12) That the Government's Priority Statute claim is limited to payments made by defendant RICHARD M. SCHLESINGER after February 13, 1995; and it is further ORDERED

(13) That on or before March 17, 2000, counsel for the United States shall confer with counsel for defendant RICHARD M. SCHLESINGER and thereafter initiate a conference call with the court on or before March 24, 2000, for the purpose of scheduling the remaining proceedings necessary to the resolution of this case; and it is further ORDERED

(14) The Clerk shall TRANSMIT copies of this ORDER, the foregoing MEMORANDUM and the within JUDGMENT to all counsel.

## INTERLOCUTORY JUDGMENT ORDER

In accordance with the foregoing Memorandum, it is this 10th day of March, 2000, by the United States District Court for the District of Maryland, ORDERED AND ADJUDGED

That judgment is entered in favor of Plaintiff UNITED STATES OF AMERICA against defendant RICHARD M. SCHLESINGER for the sum of ONE HUNDRED EIGHTY–FIVE THOUSAND ONE HUNDRED NINETY–THREE AND 19/100 ($185,193.19) DOLLARS.